KAREL MARSHAK *v.* SYLVIA MARSHAK ET AL.
(14667)

PETERS, C. J., CALLAHAN, BERDON, NORCOTT, KATZ, PALMER
and SANTANIELLO, Js.

Argued April 1—decision released July 27, 1993

*Walter H. Scanlon,* for the appellant (defendant James Ambadjes).

*Robert P. Hanahan,* for the appellee (plaintiff).

CALLAHAN, J. This appeal principally concerns the scope of liability for an action that the plaintiff, Karel Marshak, initiated against the defendants, Sylvia, Evelyn and Jacquelyn Marshak and James Ambadjes, for damages she allegedly sustained as a result of their assistance in the abduction of her children by Sheldon Marshak, her husband and the children's other custodial parent. The plaintiff filed a complaint against the defendants claiming that each was liable to her for damages for conspiracy to interfere with her custodial relationship with the children, intentional infliction of emotional distress, and aiding and abetting in the children's abduction. The trial court, *Blue, J.,* rendered a

judgment in favor of the plaintiff against Sylvia and Evelyn Marshak and James Ambadjes on the ground that they were liable to her for conspiracy and aiding and abetting.[1] Ambadjes appealed from the judgment of the trial court to the Appellate Court, and we transferred his appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[2]

The trial court found the following relevant facts. Prior to the abduction of the children, Sheldon Marshak and the plaintiff were married in Waterbury on March 22, 1975, and had lived together as husband and wife with six children in their home in Cheshire. The plaintiff had custody of two children from an earlier marriage. During her marriage to Sheldon, she had given birth to four more children, who are the children involved in this litigation.

Sheldon operated a paint and building supply business in Waterbury. The defendant lived in Waterbury where he had owned and operated a body shop known as Ambas Auto Works. Sheldon and the defendant frequently had conducted business together. They also appeared to be close friends. Sheldon had occasionally taken his children to the defendant's house, and the defendant had stored a number of motor vehicles on the Marshak property. In 1985, the defendant and his wife had decided that they would purchase a lot from

---

[1] At the conclusion of the plaintiff's case-in-chief, the trial court granted the defendant Jacquelyn Marshak's motion for a directed verdict in her favor concerning the claims against her.

The defendants Sylvia and Evelyn Marshak filed a separate appeal of the trial court's judgment. Both, however, withdrew their appeal on December 9, 1992. The defendant James Ambadjes is the only defendant involved in this appeal and all references hereinafter to the defendant are to him. The trial court's decision makes it abundantly clear that the aid furnished by Sylvia and Evelyn, particularly that furnished by Sylvia, was the most substantial factor in permitting Sheldon Marshak to be able, over the years, to remain outside the country with the children.

[2] The defendant's appeal came before this court sitting en banc.

the Marshaks and planned to build a house next to the Marshaks' home in Cheshire. The defendant and his wife met with Sheldon and the plaintiff in June, 1985, to negotiate the purchase of the lot. They reached an agreement whereby a deposit would be placed on the property. There was no documentation of the agreement. The defendant's wife, however, on June 10, 1985, had written a check for $1000 to Sheldon. Thereafter, on July 1, she had written a check for $1000 to the plaintiff and on July 15, had made out three bank checks in the amount of $1000 each to the plaintiff. On August 1, 1985, a check in the amount of $3600 had been issued by Ambas Auto Works to Sheldon Marshak.[3]

Toward the end of July, 1985, the plaintiff had told Sheldon that she wanted a divorce. On August 6, 1985, she had consulted a lawyer for the first time. Also on August 6, 1985, Sheldon had gone to the Ambas Auto Works and had asked the defendant if he would drive him and his children to John F. Kennedy International Airport in New York the next day. The defendant had agreed. Sheldon had then returned home at approximately 7 p.m. on August 6 and had begun an altercation with the plaintiff. Fearing that Sheldon would assault her, she had run to a telephone in the house to call the police.[4] Sheldon had followed her and, before she could reach the phone, he had ripped it from the wall. The plaintiff had then fled to other parts of the house, attempting to reach other phones, only to have her husband rip the phones from the wall before she could use them. Thereafter, Sheldon had gathered the children together and had ordered them into his car. After getting into the car with the children, he informed the plaintiff, who had exited the house in an attempt

---

[3] The trial court did not make a specific finding regarding the relevancy or import of the payments to the plaintiff's claims.

[4] Sheldon Marshak was six feet tall and weighed three hundred pounds.

to prevent his leaving with the children, that if she did not get out of the way he would "run over" her and he then drove off.

Approximately one hour after this incident, the plaintiff called Sylvia Marshak, Sheldon's mother, at her home in Waterbury and inquired whether Sheldon was there. Sylvia denied knowing where he was. The plaintiff's brother then drove by Sylvia's house and observed Sheldon's car parked in her driveway. Sheldon later drove to the defendant's house with the four children and remained there for forty-five minutes to one hour. At 2:30 the next morning, August 7, Sheldon called the plaintiff. He told her that he was in New York and that he intended to take the children to the Bronx Zoo that day. He also said that he was going to get some counseling from a rabbi and return home the following evening. Instead, at approximately 7:45 that morning, Sheldon again went to the defendant's house with his children. Later that morning the defendant drove Sheldon and the children to the John F. Kennedy International Airport in Sheldon's car. En route to the airport, they stopped at the United States state department office in Stamford in order to obtain passports for the children. There the defendant apparently signed an affidavit identifying Sheldon so that Sheldon was able to obtain the passports. The defendant then drove to New York and dropped Sheldon and the children off at the airport where they boarded a plane for a flight to Tel Aviv, Israel. After leaving Sheldon and the children at the airport, the defendant drove Sheldon's car back to Waterbury and parked it in front of his own house.

Worried that her husband had not returned with the children, the plaintiff called the defendant at approximately 1:30 a.m. on August 8. The defendant told the plaintiff that he had not seen Sheldon in several days.[5]

---

[5] On August 8, the plaintiff also called Sylvia Marshak, who likewise told her that she had not seen Sheldon.

When there was still no sign of the children by August 9, the plaintiff again called the defendant and pleaded with him to tell her where Sheldon and the children had gone. Again, the defendant denied knowing where they were. Also on August 9, still unaware of the whereabouts of her husband and children, the plaintiff filed an ex parte application for a protective order and a dissolution of marriage complaint with the Superior Court in Waterbury.[6] Judge Robert Glass granted an ex parte protective order and awarded the plaintiff temporary custody of the four missing children. Also on August 9, Judge John Ottaviano, Jr., signed a warrant for Sheldon's arrest for the crimes of disorderly conduct and reckless endangerment based on the incident of August 6 at the Marshak home.

On August 16, 1985, the defendant went to the Marshaks' property and removed some of the vehicles that he had stored there. At that time, the plaintiff again asked the defendant if he had seen Sheldon and he again denied having seen Sheldon or knowing his whereabouts. During the trial, however, he admitted that he had spoken to Sheldon on the telephone on a weekly basis the first four to six weeks after Sheldon had flown to Israel. On August 19, the trial court, *Kremski, J.,* held a hearing on the plaintiff's application for temporary protective and custody orders and granted a continuance of the August 9 ex parte orders for ninety days. On September 23, the defendant returned to the Marshak property and removed more of his vehicles. At that time, he said nothing to the plaintiff regarding Sheldon's whereabouts.

---

[6] The trial court in the present action took judicial notice of the file in the action for dissolution of the marriage between Karel and Sheldon Marshak. *Marshak* v. *Marshak,* Superior Court, judicial district of Waterbury, Docket No. 73483 (July 2, 1987), aff'd, 17 Conn. App. 835, 556 A.2d 189 (1989).

Finally, on October 15, 1985, two months after the children had been removed from their home, the plaintiff received a telephone call from Sheldon. He told her that if she did not withdraw her dissolution action, she would never see the children again. On October 28, 1985, the Superior Court awarded pendente lite custody of the four missing children to the plaintiff.[7]

On February 10, 1986, the plaintiff, having learned that Sheldon was in Israel with the children, flew to that country in the first of several costly efforts to find the children and bring them back to Connecticut. The plaintiff located her husband and the children in Israel. She thereafter took up residence in Jerusalem and commenced legal proceedings there to recover custody of the children. Those proceedings resulted in an agreement, on April 22, 1986, pursuant to which the parents were to have joint custody of the children and Sheldon was to return the children to the United States by June 28, 1986. The plaintiff returned to Connecticut to await their arrival. Neither Sheldon nor the children, however, returned.

This precipitated two more trips to Israel by the plaintiff. On the second trip, the plaintiff participated in court proceedings in Jerusalem that had been initiated by Sheldon to gain custody of the children for himself. On November 19, 1987, however, the Israeli court rendered a judgment awarding custody of all four children to the plaintiff. The court stayed execution of its judgment for fifteen days to allow Sheldon to appeal. While the judgment was stayed, Sheldon took the children out of school and disappeared.

---

[7] On July 2, 1987, a judgment granting a dissolution of the Marshaks' marriage was filed in the Superior Court in Waterbury. In his opinion granting the dissolution, Judge Robert Wall found intolerable cruelty by Sheldon toward the plaintiff and an irretrievable breakdown of the marriage. Judge Wall awarded sole custody of the four children to the plaintiff.

The plaintiff next located her husband in Brazil. She flew to Brazil in June, 1991, and had Sheldon arrested in Sao Paulo. Before she could gain custody of the children, however, Sheldon was released by the police. He and the children thereafter disappeared and their current whereabouts are unknown to the plaintiff.

To commence this action the plaintiff, on February 7, 1989, filed a complaint against the defendant and her husband's mother and sisters claiming that they were jointly and severally liable for the damages she had suffered and was suffering as a result of the loss of the children. In three separate counts the plaintiff asserted that the defendant was liable for conspiracy to interfere with her custodial relationship, intentional infliction of emotional distress, and aiding and abetting in the abduction of her children.

On January 16, 1992, the trial court, *Blue, J.*, after hearing three days of testimony and examining a number of documents, made extensive factual findings and reviewed the claimed theories of liability as they applied to all of the defendants. The court initially decided against using the plaintiff's claim for intentional infliction of emotional distress as a basis for the defendants' liability. It reasoned that an action for intentional infliction of emotional distress exists in the context of behavior directed at a claimant and it is unlikely that abductions ordinarily occur for the specific purpose of tormenting the claimant. The trial court then adverted to the tort of child abduction (or interference with custodial relationship) and considered whether such a tort was, or should be, a legally cognizable cause of action in Connecticut. After reviewing authority from other jurisdictions, and the policy supporting such a cause of action, the trial court concluded that the tort of child abduction should be recognized by the Connecticut judiciary.

The court then found that the defendant was liable to the plaintiff for having conspired with Sheldon Marshak and having aided and abetted him in committing the tort of child abduction. The trial court found that "[i]t is . . . a fair inference from the facts already described and about to be described that [the defendant] knew very well that he was participating in a forcible abduction." The trial court further found that "[the defendant's] conduct differs from Sylvia's and Evelyn's in that it was largely limited to assisting Sheldon in the initial abduction of August 6–7, 1985. [The defendant's] role was, however, a crucial one, for he took Sheldon and the children to the airport and enabled them to get passports. Without this assistance, none of the remaining events of this sad case would have been possible. The court finds [the defendant's] assistance to have been both substantial and necessary. The court has already found that he acted with full knowledge of what he was doing in combination with Sheldon. Under the circumstances he became a coabductor and, like Sylvia and Evelyn, a joint tortfeasor in the original sense of the term."

The trial court then found that all the defendants were the proximate cause of the damages to the plaintiff for the loss of her children's companionship, loss of parental rights, emotional distress, and her economic loss. The court concluded, consequently, that the defendants were jointly and severally liable to the plaintiff for such damages in the amount of $886,499.

Following the rendering of the trial court's judgment in a memorandum of decision dated January 16, 1992, the defendant filed a motion to set aside the judgment. He argued that because there was no evidence offered at trial as to his alleged complicity in the conspiracy after August, 1985, he should be allowed to amend his pleadings to add the special defense of the statute of

limitations pursuant to General Statutes § 52-577.[8] The trial court denied the defendant's motion.[9]

On appeal, the defendant claims that the trial court improperly: (1) refused to open the judgment to allow him to amend his pleadings to allege a special defense of the statute of limitations that would have defeated any liability for his alleged participation in the tort of child abduction; (2) concluded that the defendant was liable for the tort of child abduction when the children's father had joint legal custody of the children at the time of their removal from the family home; (3) disregarded the effect of the Israeli custody agreement of April 22, 1986, between the plaintiff and her former husband on the defendant's culpability; and (4) recognized the tort of child abduction when there is no such cause of action in Connecticut and when the complaint did not seek recovery under this common law theory, but rather under §§ 53a-97 and 53a-98 of the penal code, which do not provide a basis for civil liability. Because we agree with the defendant on his second claim, that the trial court improperly concluded that he was liable for child abduction under the circumstances of this case, we reverse the judgment of the trial court as to him. Consequently, we are not required to address the defendant's remaining claims.

---

[8] "[General Statutes] Sec. 52-577. ACTION FOUNDED UPON A TORT. No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[9] After the trial court's judgment, the defendant filed a motion to articulate requesting that the trial court articulate its decision concerning twenty-four specifics. The trial court denied this motion. The defendant thereafter filed a similar motion to articulate with the Appellate Court, which granted the motion and ordered the trial court to respond to several questions raised in the motion. The questions largely addressed the issues concerning the defendant's liability, if any, after Sheldon and Karel Marshak had entered into a joint custody agreement on April 22, 1986, in Israel. The trial court responded that such an agreement did not diminish the defendant's liability because the agreement had been broken by Sheldon; Sheldon's breaking the agreement was not the sole proximate cause of the plaintiff's injuries; and it was foreseeable that Sheldon would breach such an agreement.

The defendant claims that because the children's father had joint legal custody of the children at the time of their removal from the family home, the trial court improperly concluded that he was liable for conspiring with the father and aiding and abetting him in the abduction of the children. We agree.

In its memorandum of decision, the trial court, after stating that courts in other jurisdictions have recognized the tort of child abduction; see *DiRuggiero* v. *Rodgers,* 743 F.2d 1009, 1017–18 (3d Cir. 1984) (applying New Jersey law); *Bennett* v. *Bennett,* 682 F.2d 1039, 1044 (D.C. Cir. 1982) (D.C. law); *Fenslage* v. *Dawkins,* 629 F.2d 1107 (5th Cir. 1980) (Texas law); *Hinton* v. *Hinton,* 436 F.2d 211, 212–13 (D.C. Cir. 1970) (D.C. law); *Kunz* v. *Deitch,* 660 F. Sup. 679, 683 (N.D. Ill. 1987) (Illinois law); *Lloyd* v. *Loeffler,* 539 F. Sup. 998, 1004 (E.D. Wis.), aff'd, 694 F.2d 489, 495–97 (7th Cir. 1982) (Wisconsin law); *Kajtazi* v. *Kajtazi,* 488 F. Sup. 15, 19 (E.D.N.Y. 1978) (New York law); *Abdul-Rahman Omar Adra* v. *Clift,* 195 F. Sup. 857, 866–67 (D. Md. 1961); *Simmons* v. *Simmons,* 41 F. Sup. 545, 548–49 (E.D.S.C. 1941) (South Carolina law); *Borer* v. *American Airlines, Inc.,* 19 Cal. 3d 441, 451 n.3, 563 P.2d 858, 138 Cal. Rptr. 302 (1977); *D & D Fuller CATV Construction, Inc.* v. *Pace,* 780 P.2d 520, 523–24 (Colo. 1989); *Shields* v. *Martin,* 109 Idaho 132, 136–38, 706 P.2d 21 (1985); *Whitehorse* v. *Critchfield,* 144 Ill. App. 3d 192, 194–95, 494 N.E.2d 743 (1986); *Montgomery* v. *Crum,* 199 Ind. 660, 669–73, 161 N.E. 251 (1928); *Wood* v. *Wood,* 338 N.W.2d 123, 127 (Iowa 1983); *Murphy* v. *I.S.K.Con. of New England, Inc.,* 409 Mass. 842, 859–61, 571 N.E.2d 340 (1991); *Larson* v. *Dunn,* 460 N.W.2d 39, 44–45 n.3 (Minn. 1990); *Plante* v. *Engel,* 124 N.H. 213, 216, 469 A.2d 1299 (1983); *La Grenade* v. *Gordon,* 46 N.C. App. 329, 332, 264 S.E.2d 757 (1980); *McBride* v. *Magnuson,* 282 Or. 433, 435–37,

578 P.2d 1259 (1978); *Bedard* v. *Notre Dame Hospital,* 89 R.I. 195, 198, 151 A.2d 690 (1959); *Hershey* v. *Hershey,* 467 N.W.2d 484, 488–89 (S.D. 1991); *Silcott* v. *Oglesby,* 721 S.W.2d 290 (Tex. 1986); concluded that such a tort should be recognized in Connecticut. The court further noted that such a cause of action was sanctioned by the Restatement (Second) of Torts (1977), § 700, which provides: "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent."[10]

Section 700 of the Restatement (Second), however, does not expressly state that it applies to third parties acting at the direction of, or in complicity with a parent legally entitled to the joint custody of a child. The trial court nevertheless reasoned that because an abducting parent can be held liable for taking a child from a custodial parent, any third person who conspires with an abductor, or aids or abets in the abduction of a child, can also be held liable. See, e.g., *Fenslage* v. *Dawkins,* supra, 1109; *Lloyd* v. *Loeffler,* supra; *Kajtazi* v. *Kajtazi,* supra; *Kipper* v. *Vokolek,* 546 S.W. 521, 525–26 (Mo. App. 1977); *La Grenade* v. *Gordon,* supra, 331. In order to extend liability to the defendant, the trial court noted that §§ 53a-97 and 53a-98 of the penal code forbid the abduction of a child from a parent.[11]

---

[10] Since 1938, the American Law Institute has recognized as a cause of action conduct "inducing [a] minor child to leave or not to return home." Restatement (First), Torts (1938) § 700.

Comment (g) of § 700 of the Restatement (Second) of Torts (1977) allows the parent to recover for loss of society, emotional distress, loss of service, and reasonable expenses of regaining the custody.

[11] "[General Statutes] Sec. 53a-97. CUSTODIAL INTERFERENCE IN THE FIRST DEGREE: CLASS D FELONY. (a) A person is guilty of custodial interference in the first degree when he commits custodial interference in the second degree as provided in section 53a-98: (1) Under circumstances which

General Statutes § 53a-98 provides that a person is guilty of custodial interference when: "(1) Being a relative of a child who is less than sixteen years old and intending to hold such child permanently or for a protracted period and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian . . . or (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child."[12] By referencing these statutes, the trial court suggested that third party civil liability can be imposed on any person, including a nonparent, for conspiring with, or aiding or abetting another to violate their provisions. That appears to have been the trial court's basis for creating a legal duty owed by the defendant to the plaintiff.[13] Cf. *Lloyd* v.

expose the child or person taken or enticed from lawful custody or the child held after a request by the lawful custodian for his return to a risk that his safety will be endangered or his health materially impaired; or (2) by taking or enticing the child or person out of this state.

"(b) Custodial interference in the first degree is a class D felony."

"[General Statutes] Sec. 53a-98. CUSTODIAL INTERFERENCE IN THE SECOND DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of custodial interference in the second degree when: (1) Being a relative of a child who is less than sixteen years old and intending to hold such child permanently or for a protracted period and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian; (2) knowing that he has no legal right to do so, he takes or entices from lawful custody any incompetent person or any person entrusted by authority of law to the custody of another person or institution; or (3) knowing that he has no legal right to do so, he holds, keeps or otherwise refuses to return a child who is less than sixteen years old to such child's lawful custodian after a request by such custodian for the return of such child.

"(b) Custodial interference in the second degree is a class A misdemeanor."

[12] Subdivision (2) of § 53a-98 (a) is irrelevant to this appeal.

[13] The framework for employing a criminal statute to derive a cause of action in tort was set forth by the United States Supreme Court in *Cort* v. *Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975). "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class

*Loeffler,* supra (liability based on Wisconsin's criminal statute); *Rosefield* v. *Rosefield,* 221 Cal. App. 2d 431, 433, 34 Cal. Rptr. 479 (1963) (liability based on California's criminal statute); *Spencer* v. *Terebelo,* 373 So. 2d 200, 202 (La. App. 1979) (liability based on Louisiana statute).

The trial court noted that liability could be imposed for child abduction upon a third party who aided another in the removal of a child from its custodial parent under a civil conspiracy theory. The contours of "a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Williams* v. *Maislen,* 116 Conn. 433, 437, 165 A. 455 (1933).

We agree with the trial court that the recognition of the tort of child abduction or custodial interference, as applied to either a parent or a third party, might well play an important role in encouraging the speedy return of abducted children to the custodial parent and in compensating that parent for the harm suffered from the child's absence. We also agree that such a tort may have a place in our jurisprudence. We disagree with the trial court's conclusion, however, that, under the circumstances of this case, the defendant was liable for such a tort.[14] In order to impose liability on a third party

for whose *especial* benefit the statute was enacted' . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" (Emphasis in original.) Id.

[14] Authorities unanimously agree that the abduction of children is a grave problem. L. Karp & C. Karp, Domestic Torts: Family Violence, Conflict & Sexual Abuse (1989) § 5.01; S. Abrams, Children in the Crossfire: The Tragedy of Parental Kidnaping (1983) p. 5; M. Agopian, Parental Child-

for conspiring with or aiding another in the removal of children from the custodial parent, the third party must have conspired with, or aided the other, "to do a criminal or an unlawful act or a lawful act by criminal or unlawful means." *Williams* v. *Maislen,* supra. In this case, however, civil liability was predicated on acts that were not themselves unlawful when they occurred because on August 7, 1985, the date on which the defendant drove the children and their father to New York, the father still had joint legal custody of the children.[15]

Under existing law, a factual predicate for any tort related to child abduction, however derived, is the unlawful custody of a child. The Restatement (Second) of Torts, § 700, for instance, does not impose liability on a parent who has legal custody of a child. Comment (c) to § 700 provides: "When the parents are by law jointly entitled to the custody and earnings of the child, no action can be brought against one of the parents who abducts or induces the child to leave the other." Similarly, although a duty to a custodial parent may be inferred from §§ 53a-97 and 53a-98 of the penal code, the breach of such a duty would take place only if the alleged abductor in fact knows that he has no "legal right" to the child's custody.

The trial court did not find that the defendant had knowingly conspired with the plaintiff's husband, Sheldon, or had aided and abetted his actions at a time other than when Sheldon had joint legal custody of the chil-

---

Stealing (1981) p. 1. Statistics on the abuses related to child abduction are contained in the Office of Juvenile Justice and Delinquency Prevention, United States Department of Justice, Missing, Abducted, Runaway and Thrownaway Children in America (1990) p. i.

[15] General Statutes § 45a-606 provides in relevant part: "The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal."

dren.[16] The trial court in fact stated in its memorandum of decision that "Sheldon had joint custody of the children until August 9, 1985, by which time they were in Israel and [the defendant's] role (and Sylvia's and Evelyn's initial roles) had already been played." The trial court nonetheless concluded that the fact that Sheldon had joint legal custody of the children during the time the defendant had allegedly conspired with and assisted him did not relieve the defendant of liability. To hold otherwise, according to the trial court, "not only overlooks the outrageousness of [his] actions prior to August 9, 1985, but it ignores the actual policy of the law."

The trial court noted that § 700 of the Restatement (Second) of Torts is directed at actions "brought against one of the parents." The court determined, however, that "[a]ctions against third parties assisting those parents stand on an altogether different footing." According to the trial court, the defendant, unlike a parent, is not jointly entitled to the custody of the child and, as a third party, had "no right to decide who should have their custody." The trial court therefore concluded that the defendant's actions in assisting the father at a time when the father was jointly entitled to custody of the children provided the requisite basis for imposing liability upon the defendant for the harm the plaintiff had suffered up until the time of the trial. We disagree.

The absence of a specific finding by the trial court that the defendant had conspired with or aided the children's father at a time after the father had been stripped of any legal entitlement to custody of the chil-

---

[16] Nor did the trial court find that the defendant had conspired with Sylvia and Evelyn Marshak whose activities in support of Sheldon appear to have continued long after Sheldon had been divested of any legal right to the custody of the children.

dren is fatal to the plaintiff's claim. Although the trial court correctly stated that, standing alone, the plaintiff's claim that the defendant had conspired with or aided her husband was insufficient unless based on some underlying cause of action; see *Carney* v. *DeWess,* 136 Conn. 256, 262, 70 A.2d 142 (1949); *Williams* v. *Maislen,* supra; the trial court failed to find the facts necessary to satisfy the elements of an independent underlying cause of action. On August 7, 1985, when the defendant drove Sheldon and the children to the airport, Sheldon had not yet violated either §§ 53a-97 or 53a-98. Sheldon violated those provisions only after August 9, 1985, the date on which the court granted the plaintiff temporary custody of the children. The trial court, however, made no finding that the defendant conspired with or assisted Sheldon after August 7, 1985. The trial court found to the contrary that on August 7, the defendant's role "had already been played." It would be an overly expansive reading of § 700 of the Restatement to impose liability for conspiracy on third parties, such as the defendant, who have agreed to assist or have assisted another in doing something that at the time was not unlawful. Moreover, although the legislature, by enacting §§ 53a-97 and 53a-98 of the penal code, may have codified a duty not to interfere with the rights of a custodial parent, the breach of such a duty can occur only if in fact the provisions of those statutes have been violated. A contrary construction would expand the ambit of such provisions "by implication to create a liability which no language of the act purports to create." *Nowak* v. *Nowak,* 175 Conn. 112, 125, 394 A.2d 716 (1978).

The plaintiff argues, and the trial court concluded, however, that an expansion of the coverage of the tort of child abduction to apply to the present facts was warranted because it was reasonably foreseeable to the defendant that his actions on August 7, 1985, would

subsequently deprive the plaintiff of the rightful custody of the children. In the view of the plaintiff and the trial court, the reasonable foreseeability that his actions might ultimately result in the unlawful abduction of the children by their father was sufficient to attach continuing liability to the defendant. To support this argument, the plaintiff reasons that because the basis of the defendant's liability was an alleged conspiracy, the defendant's liability continued to attach to the foreseeable consequences of his actions. We disagree.

"[T]here is no such thing as a civil action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." *Cole* v. *Associated Construction Co.*, 141 Conn. 49, 54, 103 A.2d 529 (1954). That the plaintiff has made an "allegation as to conspiracy brings no strength to the declaration, for it shows no additional cause of action." Id.

The trial court found that the defendant in assisting Sheldon had acted at a time that predated the award of sole custody of the children to the plaintiff, when Sheldon was entitled to their joint custody. The court, moreover, did not make a specific finding that any alleged conspiracy entered into, or aid furnished to Sheldon by the defendant, continued beyond August 7, 1985.[17] The court found rather that the defendant's role had already "been played" by the time that sole custody of the children was first awarded to the plaintiff on August 9, 1985. The defendant's conduct, therefore, even if in pursuance of an agreement to assist Sheldon to take his children to Israel, was not, when completed, unlawful. Conduct that was not unlawful when

---

[17] At oral argument the plaintiff conceded that the trial court had never made a specific finding linking Sheldon's phone calls to the defendant to the alleged conspiracy.

consummated cannot be the basis for damages or continuing liability in order to accomplish what may appear to be a desirable result. *Jones* v. *O'Connell,* 189 Conn. 648, 662, 458 A.2d 355 (1983).

Without an independent basis for finding illegality in the defendant's actions in allegedly conspiring with and aiding Sheldon prior to August 9, 1985, the date of the order awarding custody to the plaintiff, and in the absence of a specific finding that the defendant conspired with or aided Sheldon subsequent to that date, the plaintiff cannot prevail on her claim against this defendant.[18] Id.

The judgment is reversed and the case is remanded with direction to render judgment in favor of the defendant.

In this opinion the other justices concurred.

---

[18] Our conclusion should not suggest that we are limiting the class of potential defendants against whom the tort of child abduction might apply, nor precluding the extension of liability to third parties who conspire with and aid others in abducting children. Imposition of such liability may well be efficacious in deterring child abductions. See *Fenslage* v. *Dawkins,* 629 F.2d 1107 (5th Cir. 1980); *Lloyd* v. *Loeffler,* 539 F. Sup. 998, 1004 (E.D. Wis.), aff'd, 694 F.2d 489, 495–97 (7th Cir. 1982); *Kajtazi* v. *Kajtazi,* 488 F. Sup. 15, 19 (E.D.N.Y. 1978).