[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT #157
This litigation concerns the 1996 sale of property located in Milford, Connecticut which, during the 1980's, had been used by gasoline service stations, used car lots and/or car repair (body shop) garages. The CT Page 6154 plaintiffs in the action (Edward A. Visconti, Jr., Edward A. Visconti, Jr. d/b/a E.A. Visconti Sons a/k/a Visconti Sons; Surrogate Wheels of Milford, Inc. and Auto Specialists of Milford, LLC) include the purchaser of the property, Edward A. Visconti, Jr. (Visconti) and related entities. The defendants include the seller of the property, Pepper Partners Limited Partnership (Pepper Partners), Ernest A. Wiehl, Jr. (Wiehl) and Richard V. Wiehl and Consumer Petroleum of Connecticut Incorporated (Consumer Petroleum). The plaintiffs essentially claim that the property is environmentally contaminated and that the defendants are liable to them because of the condition of the property and the conditions associated with the sale of the property.
The complaint is in 12 counts. The original complaint filed March 1, 1999, has been amended and revised. The operative complaint is dated February 8, 2001. The 12 counts of the complaint are as follows: fraud (count 1); fraudulent nondisclosure (count 2); fraudulent prevention of inquiry (count 3); civil conspiracy (count 4); breach of the covenant of good faith and fair dealing (count 5); breach of contract (count 6); negligent misrepresentation (count 7); negligence (count 8); negligence per se pursuant to General Statutes § 22a-427 (count 9); liability under General Statutes § 22a-452 for reimbursement (count 10); liability under General Statutes § 22a-16 (count 11); and a claim for violation of the Connecticut Unfair Trade Practices Act (CUTPA) (count 12). Pursuant to Practice Book § 17-44, the defendants have moved for summary judgment on all twelve counts of the amended complaint. The plaintiffs have opposed the motion for summary judgment.
The real property of interest is located at 199-211 Naugatuck Avenue, Milford, Connecticut. The property was purchased by Wiehl in 1980. Wiehl leased the property to the defendant Consumer Petroleum, which, in turn, subleased the property to third party entities that operated gasoline service stations, used car lots and/or car repair garages on the property until 1989. In 1989, Wiehl transferred title of the property to defendant Pepper Partners. Pepper Partners is a limited partnership. Prior to February of 2000, Wiehl was the general partner with a 99% ownership interest in the partnership, and his wife was a limited partner with a 1% ownership interest.
The defendant Richard Wiehl is the son of Ernest Wiehl. He is neither employed by Pepper Partners, nor does he have any ownership interest in the partnership.
The defendant Consumer Petroleum is a Connecticut corporation whose primary business is the wholesale delivery of petroleum products to gasoline service stations. Wiehl was president, director and sole shareholder of Consumer Petroleum until December of 1990. In December of CT Page 6155 1990, his interest in Consumer Petroleum were transferred to his son, the defendant Richard Wiehl. The defendants Consumer Petroleum and Richard Wiehl have never had an ownership interest in the subject property. None of the defendants have operated a gasoline service station or a car repair facility on the property at any time. None of the defendants has ever held an ownership interest in the entities that operated service stations or garages on the property. Consumer Petroleum supplied petroleum products to the tenants operating service station garages on the property.
Plaintiff Visconti had some familiarity with the property, having worked on the property at a service station in 1977. He was first interested in purchasing the property in 1989, at which time he filed a request with the Milford Health Department Division of Environmental Health to obtain information concerning environmental problems on the property. In late 1994 or early 1995, Visconti observed a realtor's sign on the property. In early 1995, he visited the property with a realtor (Art Overfield). Knowing that the property had been used as a service station, Visconti inquired about the underground gasoline storage tanks. Overfield responded that the tanks, along with the septic tank and the service station islands, had been removed and backfilled with clean soil. Visconti noticed a visible difference in the soil where new fill had been brought in. Visconti had a subsequent conversation with Overfield concerning the terms of the sale, but had no further discussions about the condition of the property. Visconti made an offer for the purchase of the property, which prompted a meeting with Wiehl. In their discussion, the terms of the purchase were agreed upon, whereby Visconti would buy the property for $200,000 ($5,000 in cash and $195,000 in a purchase money mortgage on the property). Wiehl reiterated Overfield's report that the underground gas storage tanks, septic tanks and service station islands had been removed, along with contaminated soil and clean soil brought in so as to "satisfy the authorities." These conversations, one with Overfield and the other with Ernest Wiehl, were the only conversations that Visconti had with any agent or representative of the seller.
Based on these discussions, Visconti assumed that the soil was contaminated around the tank area (Visconti May 15, 2001 deposition, p. 96; Second Request to Admit p. 17.) Visconti acknowledged at his deposition that he was never informed there was no contamination left on the property (Visconti May 15, 2001 deposition, pp. 192-93; Visconti May 31, 2001 deposition, p. 20). Visconti indicated that neither Wiehl nor Overfield told him whether or not to have the property tested for environmental problems.
Visconti and Pepper Partners entered into a written sales contract CT Page 6156 providing that the buyer at his own expense could "make such inspection of the premises (including, without limitation, a Phase I environmental site assessment) as buyer deems appropriate." Visconti reviewed the contract with his attorney. Visconti did not complete the due diligence provision of the contract or undertake any investigation of the property prior to the sale. The sales contract provided that the buyer, Visconti, had inspected the property and was fully satisfied with its physical condition; that neither the seller nor any representative of the seller had made any representation, promise or warranty of any kind relating to the condition of the property; and that the buyer was accepting the property in substantially its present condition. The sales contract also expresses that Visconti was advised that the property "may fall within the definition of an `establishment;' that Pepper Partners had "made no representations of any kind . . . concerning the environmental condition of the property; and that Pepper Partners would have no obligation to provide or execute a statutorily required environmental certificate form." According to the contract, Visconti would provide and execute the requisite forms, pay all the fees associated with the environmental filings, assume responsibility for environmental testing and any necessary cleanup of the property, and indemnify Pepper Partners for any loss arising out of environmental conditions on the property.
General Statutes § 22a-134 addresses the "transfer of hazardous waste establishments." An establishment would include, pursuant to §22a-134 (3) E, property whereupon a vehicle body repair shop or vehicle painting shop was located on or after May 1, 1967. The property conveyed had been the site of a vehicle body repair shop and vehicle painting shop during the 1980's. When property with such a history is transferred, General Statutes § 22a-134a mandates that an environmental condition assessment form (ECAF) and a property transfer program-form III (Form III) must be completed as part of the sale. The ECAF provides that the certifying party must provide information known to him regarding the environmental condition of the property being transferred. The Form III provides that the certifying party agrees to take responsibility for pollution of environmental property found on the property being transferred. Pursuant to the sales contract, it was Visconti who assumed the obligation to complete and sign the environmental forms, pay the required filings fees, and assume the responsibilities for the environmental condition of the property.
Prior to the closing, Pepper Partners' attorney indicated to Visconti's attorney that the transfer act provisions would have to be complied with unless Visconti could prove to Pepper Partners that the property was not a General Statutes § 22a-134 "establishment." Pepper Partners' attorney suggested to Visconti's attorney that Visconti might wish to undertake an environmental study before closing. Pepper Partners CT Page 6157 indicated that Visconti would have to file the Form III with the Department of Environmental Protection (DEP), pay the filing fees of in excess of $2,000, and file the ECAF. Visconti was advised through counsel that Pepper Partners would release Visconti from his obligations under the sales contract, but would not sell without the transfer act filings or the filing fees certified and paid by Visconti. Pepper Partners also indicated that it would extend the time to close to allow reasonable time for Visconti to conduct any pre-closing investigation of the property. Visconti declined to perform such a site investigation, and agreed to assume responsibility for the transfer act filings and payment of the filing fees.
Pepper Partners' attorney provided to Visconti's attorney the ECAF and Form III with certain information, including a reference to the fact that a prior tenant had operated an auto body repair shop on the property. Pepper Partners' attorney understood that Visconti's attorney would review the information with his client and change the forms to reflect what Visconti knew about the environmental condition and history of the property. Visconti and his attorney made no changes in the ECAF or Form III that Visconti executed. The closing occurred on February 9, 1996. Visconti has not paid the note and mortgage since April of 1996.
"[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . A material fact is a fact that will make a difference in the result of the case. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. (Citation omitted; internal quotation marks omitted.) DaCruz v. State Farm Fire Casualty Co., 69 Conn. App. 507, 511, ___ A.2d ___ (2002). "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist. . . ." (Citation omitted.) Nolan v. Borkowski, 206 Conn. 495,500, 538 A.2d 1031 (1988).
The essence of all of the plaintiffs' claims is that the defendants had knowledge of environmental problems on the property and did not properly inform the buyer concerning such hazards. The plaintiffs cite a Milford Fire Marshal order dated November 24, 1987, regarding safety code violations with respect to the abandoned gas tanks. In 1988, the CT Page 6158 defendants engaged in environmental cleanup in the form of removal of the underground gasoline storage tanks, the gas pumps and septic tanks, some contaminated soil and its replacement with clean fill. Tests taken in 1988 revealed contamination on the site. Following the 1988 cleanup and the eviction of the then-tenant, Consumer Automobile Purchasing Services (CAPS), the property was vacant from 1989 through the plaintiffs' purchase in 1996.
In order to recover on their fraud claims, the plaintiffs must allege the essential elements of an action in common law fraud. Those elements are that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act on it; and (4) the other party did so act upon that false representation to his injury. Barbara Weisman,Trustee v. Kaspar, 233 Conn. 531, 539-40, 661 A.2d 530 (1995); Billingtonv. Billington, 220 Conn. 212, 217, 595 A.2d 1377 (1991); Kildoff v.Adams, Inc., 219 Conn. 314, 329, 593 A.2d 478 (1991). All four elements must be found to exist and the absence of any one of them is fatal to a recovery on a fraud claim. Citino v. Redevelopment Agency,51 Conn. App. 262, 276, 721 A.2d 1197 (1998).
The undisputed facts establish that the only two agents of the defendants (Wiehl and the real estate agent, Overfield) accurately represented the removal of the underground storage tanks, septic tank and gas service islands and contaminated soil. They also accurately noted the replacement with clean fill, which was observed by Visconti. The plaintiff Visconti stated that neither Wiehl nor Overfield represented that the property was environmentally clean. The only representation by the defendants that might equal a false representation would be the statement attributed to Wiehl that the 1988 cleanup satisfied the authorities.
The plaintiff cites the ECAF and Form III as other false representations. However, these documents are not signed by any of the defendants and, under the sales contract, are solely the responsibility of Visconti. Visconti's testimony is that he did not see the ECAF or Form III prior to the closing and did not read either form prior to signing them. Thus, there is no evidence whatsoever that he relied on them.
Assuming for the purpose of this motion that the representation by Wiehl — that the 1998 cleaning "satisfied the authorities" — was a knowingly untrue statement, there still must have been reliance by Visconti on that representation for him to recover on a fraud claim. In support of their claim of reliance, the plaintiffs cite and attach to their memorandum in opposition of the motion for summary judgment two pages of Visconti's deposition testimony. The pertinent parts of the CT Page 6159 deposition excerpts are as follows:
 Q So I'm trying to figure out is what it is that they never told you that the property was clean but yet you say it was supposed to be clean. Why was it supposed to be clean?
 A They took the tanks out. They took the soil. They brought clean soil in. They didn't tell me that it was clean but they didn't tell me there's still contamination on the place, either.
 Q Again, nothing prevented you from going and finding out?
 A But I didn't know that. Sorry. I really didn't know about that. If I did or they said it was a possibility, I would have just walked away.
Visconti 5/31/02 deposition, p. 186, lines 1-13.
 Q No. I'm not. I'm asking you whether they ever told you this property is clean, there's no contamination on that property? Anyone ever tell you that?
 A No. That, they didn't say, that it is spotless clean. Okay. They didn't tell me it was dirty, either.
 Q They told you they removed some soil and replaced it with some clean dirt?
 A When they took the tanks they took soil and spent a lot of money on the clean up.
 Q But they never told you there's no contamination left on the property?
A They never told me that, no. They didn't.
Q They didn't say one way or the other?
A One way or the other.
Visconti 5/15/01 deposition, p. 193, lines 1-14.
The defendants point out that Visconti in his May 15, 2001 deposition CT Page 6160 at page 96 believed that the soil "was contaminated around the tank area." It is also clearly and factually accurate that the defendants had, indeed, spent a lot of money on the 1988 cleanup, in excess of $50,000.
The undisputed facts also provide that the sales contract places the entire burden for the environmental condition of the property on the buyer (Visconti), who had the opportunity to conduct a pre-sale investigation, including specifically a "Phase I environmental site assessment." Affidavits of counsel also establish that Visconti was afforded the opportunity to obtain additional time in which to undertake any site investigation, and was offered the opportunity to walk away from his obligations under the contract if he did not want to execute the ECAF and Form III environmental forms.
In count two, the plaintiffs assert a claim for fraudulent non-disclosure of facts discovered in the 1988 cleanup revealing contamination of the property. A claim based on fraudulent nondisclosure, also alleged in counts one and three, is not available when a property is purchased "as is." Holly Hill Holdings v. Loehmann,226 Conn. 748, 628 A.2d 1298 (1993). The specific holding in Holly Hill
was that the buyer was precluded from asserting claims on the basis of alleged non-disclosure of known facts. Id., 755-56. In this case, Visconti purchased the property in its present condition not "as is," but that it is a distinction without a difference in view of the specific assumption by Visconti of responsibility for the environmental condition of the property. The party who assumes the risk under a contract and relies on only limited information assumes the risk of his mistake.Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 408456 A.2d 325 (1983). The specific contractual assignment of the environmental risk to Visconti would further preclude any disclosure obligation on the part of any of the defendants.
The fraudulent prevention of inquiry claim in the third count is unsupported by any materials provided by the plaintiffs. In contrast, the defendants rely on the specific provisions of the contract allowing due diligence, including a specific reference to a Phase I environmental investigation, as well as the affidavits of counsel to the effect that prior to closing, Visconti was expressly offered the opportunity for a delay in closing to do a specific environmental site inspection. The most that Visconti asserts is that the defendants didn't tell him to get a Phase I, even though their attorney suggested to Visconti's attorney that he get one.
Summary judgment enters for all defendants on counts 1, 2 and 3 of the amended complaint. CT Page 6161
Conspiracy
The plaintiffs' claim of conspiracy d in count four alleges that the defendants conspired to induce Visconti to purchase the property and shift to him the liability for environmental contamination. The basic requirement for a civil conspiracy claim is a combination between two or more persons. Marshak v. Marshak, 226 Conn. 652, 665, 628 A.2d 964
(1993).
At all relevant times, Wiehl was the general partner and beneficial owner of Pepper Partners. Consumer Petroleum, which at the relevant period was wholly owned by Wiehl, never owned the property and had nothing to do with the 1996 sale of the property to Visconti or the 1980 transfer from Wiehl to Pepper Partners. Wiehl's son, Richard Wiehl, was involved only to the extent that he had discussions about the property with Pepper Partners' attorneys. The conspiracy to encompass Consumer Petroleum would have to date back to 1989, some five years before any of the defendants were aware of the plaintiffs' interest in purchasing the property. The undisputed facts are that Visconti was represented by legal counsel, was not told by any of the defendants or their agents that the property was environmentally clean, specifically contracted to assume the environmental risks, was offered the opportunity to undertake a site investigation, including a Phase I environmental investigation, and assumed the filing obligations and environmental risks. There is no evidence to support a claim of civil conspiracy in the absence of any fraud on the part of any of the defendants.
The defendants are all entitled to summary judgment on the civil conspiracy count.
Breach of Covenant of Good Faith and Fair Dealing
The implied covenant of good faith and fair dealing relied upon in count five is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. Eis v. Meyer, 213 Conn. 29, 36-37, 566 A.2d 422 (1989). The principle cannot be applied to achieve a result contrary to the clearly expressed terms of a contract. Magnan v. Anaconda Industries, Inc.,193 Conn. 558, 567, 479 A.2d 781 (1984).
The plaintiffs argue in their opposition papers that a party cannot take advantage of its own wrong to injure the right of the other to receive the benefits of the agreement. The plaintiffs claim that the intent of the parties entering into the sales contract was to transfer clean property to plaintiff Visconti, not to transfer responsibility for CT Page 6162 cleaning the property. That argument is totally unsupported by the deposition of Visconti, who stated that there was no representation that the property was clean; it also is explicitly contrary to the sales contract, which placed the environmental risk on the plaintiff Visconti.
All defendants are entitled to summary judgment on the breach of covenant of good faith and fair dealing count.
Breach of Contract
Count six of the amended complaint asserts a breach of contract claim but does not articulate the specific provision of the sales contract, note or mortgage which was allegedly breached. There is no evidence to support any claim that the only defendant contracted with, Pepper Partners, in any way breached its contract of real estate conveyance, note or mortgage. The other defendants had no contractual relationship with the plaintiffs.
All defendants are entitled to summary judgment on the breach of contract claim.
Statutes of Limitation
Counts seven and eight assert claims of negligent misrepresentation and negligence; count nine asserts a claim of negligence per se pursuant to General Statutes § 22a-427; count ten claims liability under General Statutes § 22a-452, seeking reimbursement; and count eleven claims liability under General Statutes § 22a-16. The environmental claims alleged in counts nine, ten and eleven are controlled by General Statutes § 52-577c, which statute of limitation mandates that such actions "shall be brought within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered." The plaintiffs assert that they did not discover the environmental contamination until within the two-year period when they were notified by the DEP. The issue is whether the plaintiffs, in the exercise of reasonable care, should have discovered the environmental condition at the time of the sale in 1996.
There are no Appellate or Supreme Court decisions defining reasonable care under General Statutes § 52-577 (c). In Blackburn v.Miller-Stevenson Chemical Co., Superior Court, judicial district of Danbury, No. 314089 (Sept. 11, 1998, Leheny, J.), the court applied General Statutes § 52-577 (c) and rejected the plaintiff's claim that the statute did not begin to run until she had actual notice of the contamination. Relying on related statutes (General Statutes § 22a-452d
(B)iv and CERCLA, the Comprehensive and Environmental Response CT Page 6163 Compensation Liability Act of 1980, 42 U.S.C. § 96-01 et seq.), the court concluded that the term "reasonable care" includes making reasonable inquiry at the time of the acquisition. The court considered the knowledge or experience of the purchaser, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or the likely presence of the contamination of the property, and the ability to detect such contamination by appropriate inspection. Also see U.S. v. Pacific Hide Fur Depot, Inc.,716 F. Sup. 1341, 1347 (D. Idaho 1989).
In the instant case, Visconti knew that the property had been used as a service station or as a car repair body shop facility. He knew that gas pumps and underground petroleum storage tanks had been removed from the property, along with contaminated soil. He believed that the property around the tanks was probably contaminated. He was specifically afforded the opportunity under his sales contract to do a Phase I environmental investigation, and was offered an extension of the contract time for performance to conduct such an investigation. Visconti also was required to report the sale as a transfer of an establishment pursuant to General Statutes § 22a-134. The exercise of reasonable care would certainly have required a site investigation, which would have revealed the environmental condition of the property. The statute of limitations began to run in 1996.
The claim in count eleven under General Statutes § 22a-16 seeks equitable and declaratory relief from the defendants' negligent conduct in causing contamination on the property. It is uncontroverted that the property was vacant since 1989. The three-year period of limitation under General Statutes § 52-577 would apply. This is generally understood as an "occurrence statute," running from the date of the act or omission complained of. Collum v. Chapin, 40 Conn. App. 449, 451, 671 A.2d 1329
(1996). The property was owned by the plaintiffs from the date of the closing on February 9, 1996, more than three years from the date of the filing of the complaint on March 1, 1999.
Similarly, the negligence claims contained in counts seven and eight are untimely.
CONCLUSION
For the foregoing reasons, summary judgment enters for all defendants on all counts.
ROBERT F. McWEENEY, J. CT Page 6164