**CDC TECHNOLOGIES, INC., Plaintiff,**

v.

**IDEXX LABORATORIES, INC., Defendant.**

**Civ. No. 3:95CV339(JBA).**

United States District Court, D. Connecticut.

March 31, 1998.

120

Michael R. Borasky of Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for Plaintiff.

David H. Erichsen of Hale & Dorr, Boston, MA, for Defendant.

**RULING ON PLAINTIFF'S OBJECTION TO RECOMMENDED RULING [doc. 73]**

ARTERTON, District Judge.

■ In a March 12, 1998 Recommended Ruling, Magistrate Judge Garfinkel recommended that defendant IDEXX Laboratories, Inc.'s ("IDEXX") motion for summary judgment be granted because plaintiff failed to demonstrate that IDEXX's exclusive dealing contract at the distributor level impeded plaintiff CDC Technologies, Inc.'s ("CDC") ability to reach the ultimate customers of its instruments used to perform clinic hematology analyses (veterinarians), as required by Section 3 of the Clayton Antitrust Act.

The Magistrate Judge also recommended summary judgment on CDC's claims under sections 1 and 2 of the Sherman Antitrust Act, and on CDC's state law antitrust, CUT-PA, civil conspiracy and tortious interference claims. CDC objects to the Recommended Ruling on the grounds that the Magistrate Judge erroneously concluded that CDC made an insufficient showing demonstrating a factual dispute that IDEXX's exclusive dealing agreements had an adverse effect on competition in the market for its clinical veterinary hematology instruments, the basis on which the Magistrate Judge recommended dismissal of CDC's federal antitrust claims and related state law claims.

■ Section 3 of the Clayton Act makes it unlawful to sell goods on the condition, agreement, or understanding that the purchaser shall not use or deal in the goods of a competitor of the seller, where the effect may be to substantially lessen competition, or tend to create a monopoly. 15 U.S.C. § 14. "Even though a single contract between single traders may fall within the initial broad proscription of the section, it must also suffer the qualifying disability, tendency to work a substantial—not remote—lessening of competition in the relevant competitive market." *Tampa Electric Company v. Nashville Coal Company,* 365 U.S. 320, 333, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). An exclusive dealing arrangement does not violate the Clayton Act unless the probable performance of the agreement will "foreclose competition in a substantial share of the line of commerce affected." *Id.* at 327, 81 S.Ct. 623. Thus, exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are "frozen out" of the market by the exclusive deal. *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring).

Notwithstanding the Clayton Act's proscription of certain exclusive dealing agreements, such agreements that are narrow in scope pose no threat of adverse economic consequences, and indeed, "may be substantially procompetitive by ensuring stable markets and encouraging long term, mutually advantageous business relationships." *Id.;* *Tampa Electric,* 365 U.S. at 334, 81 S.Ct. 623.

■ Where market competitors may reach ultimate product consumers by using existing, or potential, alternate channels of distribution, an exclusive distributorship agreement may not foreclose competition in the market. *Omega Environmental, Inc. v. Gilbarco,* 127 F.3d 1157, 1163 (9th Cir.1997) *Ryko Manufacturing Co. v. Eden Services,* 823 F.2d 1215, 1235 (8th Cir.1987). The Magistrate Judge correctly found undisputed evidence on the submitted record that CDC has alternative avenues of reaching its end-users, which when buttressed by undisputed evidence of CDC's increase in sales since defendant entered the market, underscores the absence of evidence for jury determination of an anti-competitive effect from the exclusive arrangements at issue. Where the undisputed evidence shows that CDC continued to reach end-users in the relevant market, absent any other demonstration of anti-competitive effect, IDEXX's 80% share of the clinical hematology instrument market and its foreclosure of 65% of the distributor outlet market, claimed by CDC, are inadequate to support the inference of anti-competitiveness that their magnitude would suggest at first blush. CDC's focus on the impact of the exclusive agreements on "distributor outlets" ignores its failure to demonstrate an anti-competitive effect on the end-users in the relevant market. Inasmuch as the evidentiary showing CDC contends it has made addresses only the impact of the exclusive agreements on distributor outlets, it fails to show any anti-competitive consumer effect.

The Recommended Ruling properly focuses on whether the facts submitted by CDC demonstrated any anti-competitive effect on its relationship with end-users in the relevant market. *See Omega Environmental, Inc.,* 127 F.3d at 1163 (generally, exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anti-competitive concern); *Ryko Manufacturing,* 823 F.2d at 1235 (same). *Cf. Jefferson Parish Hospital,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (dismissing suit by unaffiliated anesthesiologist and finding no antitrust violation in exclusive agreement be-

tween hospital and anesthesiologist group providing that only doctors in that group could practice anesthesiology at hospital).

Specifically, the Magistrate Judge considered the undisputed evidence on the role of the distributors in the selling process under the challenged arrangement, namely, providing "qualified leads" only. Because the distributor does not demonstrate or sell the product to the end-user veterinarian, or otherwise negotiate about the product, and such customers actually buy the product from direct sales forces, the challenged arrangement does not translate into evidence of customer foreclosure. *See Omega Environmental,* 127 F.3d at 1163 (finding undisputed evidence that direct sales to end-users are an alternative channel of distribution in the market).

The Magistrate Judge relied on undisputed evidence of numerous alternatives on which CDC can, and did, rely to pursue direct sales to the customers, i.e., telemarketing, direct mail campaigns, customer lists, advertising, and participation in trade shows. Further, the Recommended Ruling correctly found no evidence submitted that IDEXX coerced distributors to enter into these exclusive agreements. In fact, it was not disputed that the agreements are limited in duration (one year), as well as have a 60 day terminability clause, during which time the distributor may end the agreement, further underscoring the lack of probative value of the arrangement on the issue of consumer competition foreclosure.

Because CDC has not demonstrated the existence of genuine issues of material facts such that reasonable jurors could find that IDEXXs' exclusive dealing agreements substantially lessened competition by impeding CDC's ability to reach the ultimate customers of its hematology instruments, the Court concludes that summary judgment is properly entered for IDEXX on CDC's Clayton Act claim.

■ Since the Supreme Court has expressly held that if a claim does not fall within the broader proscription of section 3 of the Clayton Act it is also not prohibited by sections 1 and 2 of the Sherman Act, IDEXX is entitled to judgment on those claims as well. *See Tampa Elec.,* 365 U.S. at 335, 81

S.Ct. 623. Similarly, the elements of Conn. Gen.Stat § 35–27 are substantially similar to the elements under § 2 of the Sherman Act, and thus fail with CDC's federal claim. *See Westport Taxi Service v. Westport Transit District,* 235 Conn. 1, 15, 664 A.2d 719 (1995) (recognizing that statute was intentionally patterned after federal antitrust law and is similar to federal law in every respect). The Connecticut Supreme Court also has held that since Conn.Gen.Stat. § 35–29 is patterned after section 3 of the Clayton Act, the elements of the federal cause of action must be used in determining whether a violation of § 35–29 has occurred, *State v. Hossan–Maxwell, Inc.,* 181 Conn. 655, 436 A.2d 284 (1980), and the failure of CDC's federal claim warrants dismissal of its § 35–29 claim. Finally, as to CDC's state law claims for civil conspiracy, tortious interference and CUTPA, the Court accepts the well-reasoned analysis set forth in the Recommenced Ruling.

Accordingly, upon review and pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 2 of the Local Rules for United States Magistrates (D.Conn.1995), the recommended ruling is APPROVED and ADOPTED as the ruling of this Court over objection.

IT IS SO ORDERED.

### Recommended Ruling on Defendant's Motion for Summary Judgment

GARFINKEL, United States Magistrate Judge.

Plaintiff, CDC Technologies, Inc. ("CDC"), brings this action against defendant, IDEXX Laboratories, Inc. ("IDEXX"), alleging unlawful exclusive dealing under 15 U.S.C. §§ 1 and 14, and Conn.Gen.Stat. § 35–29; unlawful restraint of trade under 15 U.S.C. § 1 and Conn.Gen.Stat. § 35–28; and monopolization, conspiracy to monopolize, and attempt to monopolize under 15 U.S.C. § 2 and Conn.Gen. Stat. § 35–27. Plaintiff also alleges unfair trade practices under Conn.Gen.Stat. § 42–110a et seq.; civil conspiracy; and tortious interference with business relations.

Presently pending is IDEXX's Motion for Summary Judgment (Doc. # 48). For reasons set forth below, defendant's motion is GRANTED.

## FACTS

IDEXX is a Maine-based corporation which sells products for the testing and analysis of veterinary blood samples. Among other products, IDEXX distributes the QBC® VetAutoread ("Autoread"), an instrument which performs hematology tests[1] on veterinary blood. (Def. SMF ¶ 1.) IDEXX also sells the related consumables.[2] (*Id.*) IDEXX sells the instruments both directly and through third party distributors. (Def.Mem. at p. 2.)

CDC is a Connecticut corporation which designs, manufactures and sells instruments (and the consumable products) to perform hematology analyses on veterinary blood. (Pl. SMF ¶¶ 2, 4.) CDC has sold its instruments directly through its own sales force and has used distributors to provide qualified leads[3] for instrument sales. (Pl. SMF ¶ 21.)

Both IDEXX and CDC hematology analyzers measure complete blood counts ("CBCs") on veterinary blood. The underlying technology of the instruments is identical to that used for human applications. (Def. SMF ¶ 14.) Indeed, instruments used for human applications have been adapted for use in veterinary clinics. (Def. SMF ¶¶ 15–17.)

In addition to in-clinic hematology analyzers, there are also other methods to measure CBCs of veterinary blood. Practitioners may send blood samples to independent veterinary reference laboratories at a cost of a few dollars per test. (Pl.Ex. 12 at I002447; Def.Mem. at 3.) Practitioners may use manual methods, such as microscopes. (*Id.*) CBCs may also be measured by chemical analysis. (*Id.*) Moreover, CBC tests have been performed in a wide variety of locations including animal hospitals, private practitioner laboratories, animal disease laboratories, universities, pharmaceutical and toxicology laboratories, and human laboratories. (Def.Ex. 20 at I004215.)

In early 1991, CDC contacted IDEXX to explore a possible business relationship wherein IDEXX would sell CDC's hematology products through its own sales force. (Def. SMF ¶ 18.) No agreement was ever reached, and by early 1992, CDC began to investigate other means to market its product. (Pl. SMF ¶ 20.)

In 1992 and 1993, CDC formed relationships with four major distributors: J.A. Webster, Inc. ("Webster"), A.J. Buck & Son, Inc. ("Buck"), Burns Veterinary Supply ("Burns"), and Midwest Veterinary Supply, Inc. ("Midwest"). (Pl.Mem. at 4.) CDC used these distributors to establish contact with significant veterinary clinics in the United States and to provide sales leads for its products. (Def.Mem. at 6–7.) However, CDC did not have distributor coverage throughout the entire country. (D. Carver dep. v. 2 at 30.) Additionally, CDC did not permit distributors to sell or conduct demonstrations of CDCs' hematology analyzer. (Dougherty dep. v. 1 at 218–19; Pereira dep. v. 1 at 62, 115.)

As noted above, CDC also reached customers through its direct sales force. Indeed, it found direct sales more profitable than sales through leads from distributors. (Pereira dep. v. 1 at 60–1.) CDC also relied on other methods to pursue sales including telemarketing, direct mail campaigns, customer lists, advertising, and participation in trade shows. (D. Carver dep. v. 1 at 228; Dougherty dep. v. 1 at 112–13, 170, 173–74, 186; Pereira dep. v. 1 at 37, 147.)

In 1993, IDEXX entered into an agreement with Becton Dickinson, the company that developed Autoread, to market that instrument in the United States and other parts of the world. (Def. SMF ¶¶ 49–50.) IDEXX, in certain planning documents, noted that other sellers of hematology instruments had "poor distribution" and could be "block[ed] ... at [the] distribution channel[s]" in the United States. (Pl. SMF ¶ 46.)

---

**1.** "Hematology tests" involve the counting of red blood cells, white blood cells, platelets, and associated diagnostic information.

**2.** "Consumables" are products used to treat blood samples before their analysis by the instrument.

**3.** "A qualified lead" is the identification of potential customers who have expressed interest in the purchasing of a product. (Pl. SMF ¶ 4.)

Additionally, certain of IDEXX's marketing plans noted an effort to "erect barriers to entry" and "to create an environment hostile to competitive entry." (*Id.* ¶ 47.) Moreover, Patricia Panaia, an IDEXX Marketing Manager, wrote a note on IDEXX marketing materials which stated "KILL MASCOT," an apparent reference to CDC's product. (*Id.* ¶ 50.) Although she did not recall what she meant by "KILL MASCOT," she also wrote a note on another marketing document stating, "PUT THEM OUT OF BUSINESS." Ms. Panaia explained that this note referred to a competitor, Abaxis. (*Id.*) IDEXX's goal, among other things, was to "achieve [a] dominant share of the veterinary in-clinic hematology market." (Mackinnon dep. v. 3 at 38–39; Pl.Ex. 8; Pl.Ex. 73 at I002846.)

IDEXX began selling Autoread in 1994 and offered it to its existing distributors of other veterinary products. (Def. SMF ¶ 54.) The four distributors that had previously worked with CDC (Webster, Burns, Buck and Midwest) elected to carry IDEXX's Autoread and ceased carrying CDC's hematology instruments. (Pl.Mem. at 10.)

IDEXX had a longstanding policy of denying a distributor the right to market an IDEXX product if the distributor offered a competing product from another manufacturer. (Def. SMF ¶ 52.) In 1995, this exclusive dealing policy was formalized in writing between IDEXX and its distributors (for all products including Autoread). (Def. SMF ¶¶ 59–60.) These written agreements were for a one year period, and a distributor could terminate the agreement without cause on 60 days notice. (*Id.*) Currently, IDEXX has control of at least 50% of the distributor market. (Pl.Mem. at 16.) Moreover, since IDEXX entered the in-clinic hematology market, they have accounted for 80% of the sales. (Pl. SMF ¶ 11.)

After IDEXX entered the market, CDC, initially, chose not to pursue relationships with available non-IDEXX national distributors. (Campbell dep. at 24; Caterino dep. v. 1 at 43–46; Pereira dep. v. 2 at 25–6; E.Carver dep. v. 2 at 155–56) Moreover, even before IDEXX entered the in-clinic hematology market, CDC had not had distributor coverage for some areas of the country. (D.

Carver dep. v. 2 at 30.) Eventually, CDC began once again to seek distributor relationships. By November, 1995, IDEXX had developed distributor coverage throughout much of the United States. (D. Carver dep. v. 2 at 28–29.) In April, 1996, CDC had relationships with at least eight non-IDEXX distributors. (Caterino dep. at 47.)

Over the two years following IDEXX's entry into the in-clinic hematology market, CDC doubled its direct sales force, expanded its telemarketing and increased its budget for direct mail campaigns and advertising. (D. Carver dep. v. 2 at 59–61, 70–72; Dougherty dep. v. 1 at 111–12.) Despite the loss of their major distributors, CDC's sales rate continued to increase after IDEXX entered the market. (Def. SMF ¶ 83.) CDC's sales generated by third-parties increased from 55 sales in 1992–1993 to 56 sales in 1994–1995. (Def.Mem. at 16.) CDC's direct sales increased from 52 sales in 1992–1993 to 402 sales in 1994–1995. (*Id.*)

While CDC has primarily focused its sales efforts in the United States, CDC has distributors in Korea, Canada and the United Kingdom. (E.Carver dep. v. 3 at 53.) CDC has also sold products in foreign markets. (Geisel dep. v. 1 at 132.) Likewise, IDEXX has distributors outside the United States. (Pollock dep. at 57–9.) However, IDEXX's contracts with these distributors does not include the exclusive dealing agreement at issue (Pl.Mem. at 25.)

Other companies have also developed and marketed hematology instruments for use on veterinary blood. (Def. SMF ¶ 12.) In fact, one company, ZynoCyte, Ltd., has introduced an in-clinic hematology instrument designed to analyze veterinary blood samples and has nationwide distribution of its product. (Sanderson dep. at 14–16.) Moreover, foreign companies have sold veterinary products in the United States. (D. Carver v. 4 at 54.)

### SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Fed.

R.Civ.P. Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *Id.* at 248, 106 S.Ct. 2505. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." Rule 56(c); *See Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citations omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (internal quotation marks and citations omitted). The burden of showing that no genuine dispute about any material fact exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is

summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991) (citations omitted).

### *DISCUSSION*

## I. *EXCLUSIVE DEALING CLAIMS*

■ Even if a contract is found to be an exclusive dealing arrangement, it will not violate § 3 of the Clayton Act, unless the court believes that performance of the contract "may ... substantially lessen competition" or "tend to create a monopoly."[4] *Tampa Electric v. Nashville Coal Company*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). In considering the legality of an exclusive dealing contract, a court must analyze three areas. *Tampa Electric*, 365 U.S. at 327, 81 S.Ct. 623. First, the line of commerce in question must be determined. *Id.* Second, the court must ascertain the area of competition in this line of commerce by careful examination of the market area in which the seller operates. *Id.* Finally, the court must determine whether the competition foreclosed by the exclusive dealing contract constitutes a substantial share of the market. *Id.* at 328, 81 S.Ct. 623.[5]

### A. *Relevant Product Market—The Line of Commerce in Question*

■ In an antitrust action, the first issue is to define the relevant market. *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69–70 (2d Cir.1984); *Topps Chewing Gum, Inc. v. Major League Baseball Players Assoc.*, 641 F.Supp. 1179, 1189 (S.D.N.Y.1986). Determination of the relevant market is a necessary predicate to

---

4. Section 3 of the Clayton Act states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... for use, consumption, or resale within the United States ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller where the effect of such lease, sale, or contract for Sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

5. Under § 1 of the Sherman Act, an exclusive dealing contract is unlawful if it illegally restrains trade. 15 U.S.C. § 1. For purposes of this case, the analysis of Section 3 of the Clayton Act encompasses the standard prescribed for in § 1 of the Sherman Act. *See Tampa Elec.*, 365 at 335, 81 S.Ct. 623. This Court further notes that Conn.Gen.Stat. § 35–29 is patterned after, and substantially similar to, § 3 of the Clayton Act. Therefore, examination under the Clayton Act obviates the need for a separate analysis under Conn.Gen.Stat. § 35–29. *See State v. Hossan–Maxwell, Inc.*, 181 Conn. 655, 436 A.2d 284, 288 (1980).

an examination of the defendant's alleged violations. *United States v. E.I. du Pont de Nemours and Company,* 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Market definition is an attempt to oversimplify complex economic interactions between different parties who have different costs, needs and interests. *Id.* Indeed, "[t]here is no subject in antitrust law more confusing than market definition." *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 598 (1st Cir.1993). "[T]he frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify.... Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent in answering the question." *Id.* at 599.

IDEXX defines the relevant product-market as the methods of chemical and hematological analysis of blood used to determine a CBC. (IDEXX Mem. at 3.) IDEXX maintains that the market includes at least three procedures by which practitioners attain the results of a hematology test: (1) sending a blood sample to an independent veterinary reference laboratory; (2) use of manual methods, such as microscopes; and (3) running the test on an in-clinic instrument. (*Id.*)[6] IDEXX further claims that in an early CDC business plan, CDC found that there were 250 million tests performed in the veterinary CBC market by a wide variety of means including tests in animal hospitals, private practitioner labs, veterinary reference labs, animal disease labs, universities, pharmaceutical and toxicology labs, and predominantly human labs. (Def.Ex. 20 at I004215.) Additionally, IDEXX notes, and CDC admits, that most CBCs are performed in outside laboratories (E. Carver dep. v. 5 at 33–34; Def.Ex. 37 at 12) and that CDC's expert admits that a majority of veterinarians look to sources other than CDC or IDEXX instruments for hematology testing. (Geisel dep. v. 1 at 285–86.) Finally, IDEXX maintains that the technology underlying hematology instruments is interchangeable for human and animal samples and that, therefore, products which are currently used for

analysis of human blood should be included in the product-market definition of hematology analyzers. (Def. SMF at 6–7.)

CDC counters that IDEXX's market definition is too broad and includes products different from those sold by CDC and IDEXX. (CDC Mem. at 22.) CDC claims that the product-market definition should be comprised solely of in-clinic hematology analyzers for use by veterinarians. (*Id.* at 24.) In support, CDC argues that IDEXX has focused sales efforts on customers for in-clinic instruments. (Pl. SMF at 4.) CDC also avers that IDEXX described the company's goal as to "achieve [a] dominant share of the veterinary in-clinic hematology market." (Mackinnon dep. v. 3 at 38–39; Pl.Ex. 8; Pl.Ex. 73 at I002846.) Moreover, CDC claims that CDC and IDEXX sell instruments specifically designed for use in veterinary clinics, while veterinary laboratories sell a service to test blood samples, not a product. (Pl.Ex. 2 at 1004005; Def.Ex. 22 at CDC000230.) At very least, CDC maintains, veterinary hematology instruments for in-clinic use constitute a "submarket" within the broader market of hematology blood testing. "[W]ell defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Moreover, CDC claims that blood testing other than hematology, such as chemical tests, are not part of the same market in that they use different instruments and report different information. (CDC's SMF at ¶ 16.)

Both parties submit substantial and persuasive evidence to support their vastly different market definitions. However, each of the three general items that IDEXX includes in their market definition are very different approaches to measuring CBCs. The first issue for this Court is whether these methods are "reasonably interchangeable." *Hayden Publishing Co.,* 730 F.2d at 70–71 (citing *U.S. v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). This Court cannot rule, for purposes of this motion, that in-clinic instruments are

---

**6.** CDC and IDEXX instruments are in-clinic instruments.

reasonably interchangeable with other methods for measuring CBCs.

The CDC and IDEXX in-clinic hematology instruments both measure CBCs. While outside laboratories may also measure CBCs, the competition from outside laboratories does not involve a competing instrument. Moreover, in-clinic instruments cost in the range of $10,000 whereas reference laboratories charge only a few dollars per test to measure CBCs. (*See* Pl.Ex. 12 at I002447.) Additionally, CDC argues persuasively, at least at this juncture, that laboratories provide a service as opposed to a product. *See United States v. Grinnell Corp.*, 384 U.S. 563, 572–574, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Moreover, the manual methods that IDEXX claims to be in the product market are not interchangeable with in-clinic instruments. They are arguably less sophisticated and are difficult to compare to in-clinic instruments. Finally, there are numerous exhibits [7] which assert a difference between in-clinic instruments and other products and services nominated by IDEXX for inclusion in the product market definition. These exhibits also raise a question of fact. *See Hayden Publishing Co.*, 730 F.2d at 70.

Even if this Court where to include reference laboratories and manual methods in the product market of in-clinic instruments, there is still an issue of fact as to whether in-clinic instruments are a "well-defined submarket" within the broader product market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In determining whether a submarket may exist, the Court must look at, among other things, a product's particular characteristics including its uses, its prices and its customers. *Id.* In this case, there is a wide divergence of cost in testing CBCs. (*See* Pl. Ex. 12 at I002447.) Arguably, the customers for in-clinic instruments would be larger facilities that could afford such a cost, while the customers for laboratories would be veterinarians with a small practices that requires sending blood samples to outside laboratories. Finally, while the uses for in-clinic instruments, reference laboratories, and manual methods are all to test veterinary blood, these uses may vary widely if the Court were to consider the volume, the accuracy and the manner of the testing.

In this case, there is a genuine issue of material fact concerning the relevant product market definition. "The conclusion that genuine issues of material fact preclude a finding as to relevant market as a matter of law is not unexpected." *Jennings Oil Company, Inc.,* 539 F.Supp. at 1352. Pronouncement of the relevant market definition is a question of fact, not a question of law. *Hayden Publishing Co.*, 730 F.2d at 70; *Jennings Oil Company, Inc.*, 539 F.Supp. at 1352.

B. *Relevant Market—The Area of Competition*

The Court must next consider the relevant geographic area in which the sellers operate. *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623. IDEXX argues that the relevant geographic market is the world. In support, IDEXX claims that CDC has made international sales and has relationships with foreign distributors. Additionally, they claim that there is a free flow of sales and marketing relationships internationally. Finally, IDEXX avers that foreign manufacturers sell blood-testing instruments in the U.S.

CDC maintains that the relevant geographic market is the United States. While CDC and IDEXX have sold hematology analyzers in other countries, CDC argues that there is no evidence that any foreign seller sold analyzers in the U.S. Moreover, CDC claims that the exclusive dealing arrangements imposed by IDEXX are focused on IDEXX distributors in the U.S. CDC additionally argues that they market their products very differently in foreign countries and that IDEXX's exclusive dealing contract was imposed upon distributors solely in the U.S.

For purposes of this motion, the Court concludes that the relevant geographic market is the United States. Moreover, even if the geographic market extended to foreign markets, it would not change this Court's ultimate decision.

7. (*See,* inter alia, Pl.Ex. 2 at I004005; Def.Ex. 22 at CDC 000230.)

## C. *Effect on Competition in the Relevant Market*

■ Even if there are genuine issues of material fact regarding product and geographic market definitions, the Court must still determine whether IDEXX's exclusive dealing contract foreclosed a substantial share of the more narrowly defined market. *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623.[8] Previously, the Supreme Court analyzed exclusive dealing agreements under a "quantitative" approach by considering solely the extent of the market foreclosure. *Standard Oil Co. v. United States*, 337 U.S. 293, 313–14, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). Later, the Supreme Court established a "qualitative" test which required a "rule of reason" analysis. *Tampa Elec. v. Nashville Coal Company*, 365 U.S. at 329, 81 S.Ct. 623. The rule of reason test requires a court to examine the percentage of the market foreclosed, the duration of the exclusive arrangement, the "notice of termination" period, and the competitive effect of the exclusive dealing contract in the relevant market. Mary Lou Steptoe and Donna L. Wilson, Developments in Exclusive Dealing, 10–SUM Antitrust 25, *25 (1996); *see also, Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 18, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

In this case, the dispute involves a contract between IDEXX and each of its distributors and its effect on competition in the in-clinic hematology market. Even though the contract is undisputably an exclusive dealing arrangement, it does not necessarily violate the Clayton Act. Of course, virtually all exclusive dealing arrangements foreclose a competitor from some portion of the market. *See Tampa Elec.*, 365 U.S. at 322, 81 S.Ct. 623; *see also, Omega Environmental, Inc.*, 127 F.3d at 1162 (citations omitted). Nevertheless, there may be economic benefits to exclusive dealing arrangements, including the enhancement of competition. *Omega Environmental, Inc. v. Gilbarco*, 127 F.3d

1157, 1162 (9th Cir.1997) (citations omitted). For an exclusive dealing contract to violate § 3 of the Clayton Act, the probable effect must be to foreclose competition in a substantial line of the germane market. *Tampa Electric*, 365 U.S. at 327–328, 81 S.Ct. 623; *Standard Oil v. United States*, 337 U.S. 293, 299, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); *see also, Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 45, 104 S.Ct. 1551 (O'Connor, J., concurring) ("Exclusive dealings is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of the market by the exclusive deal"). Additionally, and most significantly here, where a restraint functions at the distributor level, "it is less clear that [the] restraint ... will have a corresponding impact on the level of competition in the consumer market." *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1235 (8th Cir.1987).

In the present case, there is scant evidence that IDEXX's exclusive dealing contract at the distributor level impeded CDC's ability to reach the ultimate customers of its hematology analyzer. Initially, the Court notes that distributors have always had a limited role at CDC. Distributors have provided sales leads, but have not sold or conducted demonstrations of CDC's hematology analyzer. (Dougherty dep. v. 1 at 218–19; Pereira dep. v. 1 at 62, 115.) CDC has reached customers through its direct sales force and CDC has found direct sales to be more profitable than sales through distributors. (Pereira dep. v. 1 at 60–1.) Moreover, CDC has relied on numerous other avenues to pursue sales including telemarketing, direct mail campaigns, customer lists, advertising, and participation in trade shows. (D. Carver dep. v. 1 at 228; Dougherty dep. v. 1 at 112–13, 170, 173–74, 186; Pereira dep. v. 1 at 37, 147). Over the two years following IDEXX's entry into the in-clinic hematology market, CDC doubled its direct sales force, expanded its telemarketing and increased its budget

---

**8.** CDC's *per se* claim under § 1 of the Sherman Act is unavailing. So long as vertical arrangements between manufacturers and distributors do not involve explicit price-fixing, they are to be judged under the rule of reason test. *Business Electronics Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988).

The Court notes that exclusive dealings arrangements have never been held to a *per se* violation of antitrust laws. *See Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 101 (3d Cir. 1977); *see also*, Wayne D. Collins, Tying and Exclusive Arrangements, 720 PLI/Corp. 153, *258 (1991).

for direct mail campaigns and advertising. (D. Carver dep. v. 2 at 59–61, 70–72; Dougherty dep. v. 1 at 111–12.) Most significantly, CDC's sales increased during this period.

CDC argues that these alternate avenues to generate sales and sales leads have no bearing on whether IDEXX's exclusive dealing agreement foreclosed the distributor market. (Pl.Mem. at 26.) This Court disagrees. The issues faced by this Court are substantially similar to those faced by the Ninth Circuit in *Omega Environmental, Inc.*, 127 F.3d 1157. In *Omega Environmental, Inc.*, the Ninth Circuit reversed a $9,000,000 jury verdict, which the trial judge had trebled. The *Omega* court found alternative channels, such as direct sales, relevant to assessing market foreclosure at the distributor level. *Id.* (citations omitted). Likewise, in the present case, the numerous alternatives that CDC availed itself to in marketing its product substantially eliminated any foreclosure effect of IDEXX's exclusive dealing policy with distributors. Antitrust laws were not designed to equip CDC with IDEXX's "legitimate competitive advantage." *See Id.*

Additionally, as in *Omega*, alternate distributors existed to provide generation of sales leads. (Geisel dep. Exh. 2.) CDC had never had distributor coverage throughout the entire country. (D. Carver dep. v. 2 at 30.) Moreover, for a period of time after IDEXX entered the market, CDC chose not to pursue relationships with available non-IDEXX national distributors. (Campbell dep. at 24; Caterino dep. v. 1 at 43–46; Pereira dep. v. 2 at 25–6; E.Carver dep. v. 2 at 155–56.) When CDC again sought distributor relationships, it developed distributor coverage throughout much of the United States. (D. Carver dep. v. 2 at 28–29.) By April, 1996, CDC had formed relationships with at least eight non-IDEXX distributors. (Caterino dep. at 47.) The Court finds, therefore, that CDC was able to develop alternate distributor relationships, adequate for its purposes, despite IDEXX's exclusive dealing agreements.

This Court further concludes that the one-year duration of the IDEXX distributor contract, with its 60 day terminability clause, is sufficiently brief to negate any likelihood of substantial competition foreclosure. *See Omega Environmental, Inc.*, 127 F.3d at 1163 (citations omitted). Significantly, in *Omega*, the contract at issue had a similar one year term and 60 day terminability clause. In light of the fact that IDEXX's distributors could be released from the IDEXX contract within 60 days, CDC "need only offer a better product or a better deal to acquire their services." *Omega Environmental, Inc.*, 127 F.3d at 1164 (citations omitted).

CDC claims that distributors would be reluctant to leave IDEXX because of IDEXX's contract with these same distributors to sell other veterinary products. However, there is no admissible evidence in the record which would support such a proposition. Additionally, a distributor's reluctance to establish ties to a reasonably small company rather than a company with a strong reputation in the veterinary products market is not surprising or anticompetitive. In fact, "[i]t is the essence of competition." *Id.* (citations omitted).

Significantly, since 1994, at least one additional supplier has introduced an in-clinic hematology instrument designed to analyze veterinary blood samples: ZynoCyte, Ltd. ("ZynoCyte") (Sanderson dep. at 14–16.) IDEXX's exclusive dealing arrangements have apparently not been a substantial barrier to ZynoCyte, which enjoys nationwide distribution of its product. (*Id.*)

CDC alternatively argues that IDEXX's 80% share of the in-clinic hematology market and foreclosure of 50% of the distributor market require this Court to find a genuine issue of material fact regarding foreclosure. While, at first glance, these percentages appear significant, they "'considerably overstate the size of the foreclosure and its likely anticompetitive effect.'" *Omega Environmental, Inc.*, 127 F.3d at 1162 (quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir.1983)). In *Omega Environmental, Inc.*, the defendant captured 55% of the total market and 24% of the distributor market. Additionally, the Court found that defendant's policy foreclosed approximately 38% of the relevant market for sales. Although IDEXX's percentages of the

total market and the distributor market are higher than those in *Omega*, the analysis is the same. There is no evidence that IDEXX's distributor agreements have prevented CDC from marketing or selling its product to veterinarians. Moreover, by virtue of the relatively brief exclusive dealings contracts, with their 60 day terminability clause, CDC is not prevented from competing with IDEXX for distributors. IDEXX should not be penalized for developing a strong and successful reputation within veterinary products market. In any event, CDC's sales continued to increase significantly after IDEXX entered the market in 1994. (Def. SMF ¶¶ 81–84.)

The ultimate issue is whether an exclusive dealings contract "suppresses competition." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1304 (9th Cir.1982). In this case, CDC sells its product through direct sales, markets its products through numerous non-distributor sources, uses non-IDEXX distributors, and can compete for IDEXX's existing distributors by offering them a superior deal. "Antitrust laws require no more." *Omega Environmental, Inc.*, 127 F.3d at 1163. Even when considering the evidence in the light most favorable to CDC, this Court concludes that IDEXX's Motion for Summary Judgement must be granted with respect to CDC's exclusive dealing claims.

## II. *MONOPOLY CLAIMS*

In light of the Court's analysis under § 3 of the Clayton Act, IDEXX's Motion for Summary Judgment must also be granted with respect to CDC's claims under § 2 of the Sherman Act.[9] When there is no genuine issue of material fact regarding market foreclosure under § 3 of the Clayton Act, a claim under § 2 of the Sherman Act fails. If a claim "does not fall within the broader proscription of § 3 of the Clayton Act it follows that" it will not violate § 2 of the Sherman Act. *Tampa Elec.*, 365 U.S. at 335, 81 S.Ct.

623. For the same reasons, CDC's corresponding state claim fails.[10]

Under § 2 of the Sherman Act, the offense of monopolization requires proof of two elements: (1) monopoly power in the relevant market and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a result of a superior product or business acumen. *Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778; *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990).

CDC cannot show that IDEXX has monopoly power in the in-clinic hematology market. There is no direct evidence in the record that CDC has monopoly power. CDC's expert stated that he had not measured market power and that he did not think it "possible to quantitatively measure market power in this instance." (Geisel dep. v. 2 at 414–416.) Significantly, CDC's expert admitted that IDEXX had not reduced output of its product. (Geisel dep. v. 1 at 283.) Monopoly power is equated with a company's power over price or ability to raise prices by reducing output. *See, e.g., Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir.1989) (citation omitted).

CDC maintains that this Court should infer monopoly power from IDEXX's 80% share of the in-clinic hematology market. However, there is no evidence that this market share resulted in monopoly power in the relevant market. CDC has not shown and cannot show that IDEXX can maintain an 80% market share over a period of time. To show market power, a plaintiff must show not only that defendant had a significant share of the market, but also that this share can be sustained over a period of time. *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434–43 (9th Cir.1995). As discussed previously, there are no barriers to entry in the in-clinic hematology market. This point is illustrated by ZynoCyte's entrance into the

---

9. Section 2 of the Sherman Act states:
   Every person who shall monopolize, or attempt to monopolize, or combine to conspire with any other person or persons, to monopolize any part of trade of commerce ... shall be deemed guilty of a felony.

10. The elements of Conn.Gen.Stat. § 35–27 are substantially similar to the elements under § 2 of the Sherman Act. *See Westport Taxi Serv., Inc. v. Westport Transit Dist.*, 235 Conn. 1, 664 A.2d 719, 729 (1995). Thus, the § 35–27 claim must fall with the failure of CDC's federal claim. *Id.*

market and relationship with national distributors.[11] Additionally, CDC's own sales have significantly increased in that same market since IDEXX entered the market in 1994. Market power cannot be sustained unless there are barriers that would prevent new competitors from entering the market or existing competitors from expanding to offset any potential output reduction. *Id.* Thus, CDC's monopoly claim fails.

To prove the offense of attempted monopolization under § 2 of the Sherman Act, the plaintiff must show: (1) the intent to monopolize; (2) that defendant has engaged in predatory or anticompetitive conduct; and (3) a dangerous probability of obtaining monopoly power. *Delaware & Hudson Ry.*, 902 F.2d at 180. For reasons noted above, this claim also fails. CDC cannot show that IDEXX has a dangerous probability of obtaining monopoly power.

■ Finally, the conspiracy count, under § 2 of the Sherman Act, also fails. A conspiracy to monopolize requires proof of: (1) concerted action; (2) overt acts in furtherance of the conspiracy; and (3) specific intent to monopolize. *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir.1996). There is no evidence that any distributor intended for IDEXX to achieve a monopoly position. If one party's intent to monopolize is not shared by another party, there can be no conspiracy to monopolize. *Belfiore v. New York Times, Co.*, 826 F.2d 177, 183 (2d Cir.1987).[12] Thus, all of CDC's claims under § 2 of the Sherman Act fail as a matter of law.[13]

**11.** The Court notes that there is also a substantial possibility that companies who market products for analysis of human blood could readily market those or similar devices to the veterinary market.

**12.** Similarly, CDC's other claims under § 2 of the Sherman Act fail. CDC's claim of "leveraging" (Count III) fails as CDC cannot prove any anticompetitive effect or monopoly power in the in-clinic hematology market. *See Viacom Intern. Inc. v. Time, Inc.*, 785 F.Supp. 371, 378 (S.D.N.Y. 1992). Likewise, CDC's "essential facility" claim fails. Even assuming that the distributor market satisfied the definition of a "facility," CDC "must show that an alternate to this facility is. not economically feasible." *Twin Laboratories v. Weider Health and Fitness*, 900 F.2d 566, 568 (2d Cir.1990) (citations omitted) As previously noted,

## III. ·STATE LAW CLAIMS

### A. Civil Conspiracy

■ The elements of the tort of civil conspiracy include: " '(1) a combination of two or more persons, (2) to do a criminal or unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.' " *Marshak v. Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993) (quoting *Williams v. Maislen*, 116 Conn. 433, 437, 165 A. 455 (1933)). This count is based on the same allegations as are CDC's exclusive dealing claims. When a civil conspiracy claim fails to set forth a separate cause of action, it must be dismissed. *Marshak*, 226 Conn. at 665–66, 628 A.2d 964 (1993). Moreover, as noted above, there is no evidence of a conspiracy. Thus, IDEXX is entitled to summary judgment on this claim.

### B. Tortious Interference ·

■ A claim of tortious interference with business relations and business expectancies requires proof that IDEXX intentionally interfered with CDC's business expectancies and, in doing so, caused CDC's harm or actual loss. *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Serv. Co.*, 169 Conn. 407, 415, 363 A.2d 86 (1975). In this case, CDC cannot prove interference which caused harm or actual loss. CDC's sales continued to increase after IDEXX entered the market in 1994. In addition, many other alternative channels are available and economically feasible for CDC. Moreover, CDC cannot show that " 'denial of its use inflicts a severe handicap on potential market entrants.' " *Twin Laboratories v. Weider Health and Fitness*, 900 F.2d 566, 568 (2d Cir.1990) (quoting *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992 (D.C.Cir. 1977)). Thus, there are no severe barriers to potential or current market participants.

**13.** While certain IDEXX documents, which indicate a desire to "create barriers to entry" and to "KILL MASCOT," may raise a question as to the intent element of the monopoly claims, there is not sufficient evidence to raise a genuine issue of material fact regarding the other elements of those claims.

avenues existed for CDC to directly sell its products, pursue alternate distributors, or compete for distributors currently under contract with IDEXX. Moreover, in the absence of a contract between CDC and its former distributors,[14] IDEXX cannot be liable " 'for interfering with the rights of parties to a contract that is terminable at will.' " *Consolidated Marketing Corp. v. Carol Cable Co.*, Civ. No. H81–262 (JAC), 1985 WL 5956, Slip op. at 3 (D.Conn. Nov. 20, 1985) (Cabranes, D.J.) (citing Restatement (Second) of Torts § 768, comment I).[15]

### C. *CUTPA*

■ Finally, CDC alleges that IDEXX engaged in unfair methods of competition and unfair acts or practices in violation of Conn.Gen.Stat. § 42–110a *et seq.* ("CUTPA"). The allegations are based entirely on facts previously discussed under CDC's antitrust claims. Claims of unfair trade practices fail if no underlying antitrust violation is found. *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F.Supp. 683, 687 (D.Mass.1991); *J.H. Westerbeke Corp. v. Onan Corp.*, 580 F.Supp. 1173, 1192 (D.Mass.1984). While the Connecticut Supreme Court has not yet ruled on this issue, this Court finds the rulings of the Massachusetts district court persuasive on this issue.[16] Thus, CDC's claims under CUTPA must fall.

### *CONCLUSION*

For reasons set forth, defendant's Motion for Summary Judgment (Doc. # 48) is hereby: GRANTED. Any objections to this rec-

ommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir.1989) (per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir.1995). So Ordered this 2nd day of March, 1998 at Bridgeport, Connecticut.

March 2, 1998.

---

**14.** CDC does not allege and there is no evidence in the record that an actual contract existed between IDEXX and its distributors, but only a "relationship." (Compl ¶¶ 20–25.)

**15.** The Restatement (Second) of Torts § 768 states:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

    (a) the relation concerns a matter involved in the competition between the actor and the other and

    (b) the actor does not employ wrongful means and

    (c) his action does not create or continue an unlawful restraint of trade and

    (d) his purpose is at least in part to advance his interest in competing with the other.

**16.** Connecticut courts look to Massachusetts courts to interpret CUTPA claims because Massachusetts's unfair trade practices act is virtually identical to CUTPA. *See, e.g., Normand Josef Enterprises v. Connecticut National Bank*, 230 Conn. 486, 646 A.2d 1289, 1306 (1994) (where the Connecticut Supreme Court noted that Connecticut has "repeatedly looked to the reasoning and decisions of the Supreme Judicial Court of Massachusetts with regard to the scope of CUTPA") (citations and quotations omitted).