[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, William and Cindy Schink, commenced an action against Eileen and Frank Baker, and also against James Nizolek, Donna Nizolek and Paul Skiadas who operate and own defendant Laurel Hill Landscaping, Inc., doing business as Laurel Hill Septic Systems (Laurel Hill) alleging various claims arising out of the Schinks' purchase of residential property from Mrs. Baker located at 239 Eden Road in Stamford, Connecticut (the Premises) and the subsequent installation of a septic system at that location by Laurel Hill. Laurel Hill has commenced an action against the Schinks to foreclose on a mechanic's lien arising out of the work done on the septic system. The two cases were consolidated and tried to the court for six days between July 31 and August 10, 2001. Post trial papers were submitted in early November 2001.
 I — THE PLEADINGS
In their complaint the Schinks allege the following: (1) that the existing septic system on the Premises was not as represented by the Bakers but in fact was grossly undersized for the Premises which was CT Page 2214 advertised as a seven bedroom residence, and the misrepresentation induced the Schinks to purchase the Premises at a price above its value; (2) that Laurel Hill which inspected the system withheld material information from the Schinks about the size and condition of the septic system before the sale of the Premises and the amount and expense involved in installing a system of a size appropriate for a seven bedroom home; (3) that Laurel Hill failed to inform the Schinks that the new system installed by it for the Schinks was sized for a three bedroom house or smaller; (4) that the Schinks relied to their detriment on representations by the defendants that the existing septic system properly conformed for a seven bedroom house. The various counts sound in breach of contract, fraud, conspiracy, negligence, breach of the duty of good faith and fair dealing, and violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes § 42-110b et seq. (CUTPA)
The defendants denied the material allegations and asserted various special defenses. In addition to the mechanic's lien action, the Nizoleks, Skiadas and Laurel Hill counter claimed against the Schinks alleging that they had not been paid for installing a septic system at the Premises and claiming, inter alia, breach of contract, unjust enrichment and a violation of CUTPA.
 II — BACKGROUND FACTS
Before discussing the facts found and the resolution of the parties' claims a few observations are in order which are critical to the court's findings and ultimate disposition. The case involved several complex and hotly contested factual and legal allegations, yet there were many inconsistencies, gaps and contradictions in the testimony, other evidence, and even counsels' arguments that make it difficult to ascertain the facts or even the chronology of events. Much of what was sought to be proved remained in the realm of speculation and conjecture.
All the individual parties testified during the trial. Significant portions of their testimony were very imprecise on certain critical matters and often loaded with self justificatory conclusions not comporting with the actual facts. Additionally, there were many claims, much testimony and documentary evidence about the Connecticut Health Code, its application to septic systems in general and the system on the Premises specifically. Much of the evidence presented and claims made on this subject tended to be unspecific and ill-defined, to the point of being misleading.
In 1997 the Schinks, who rented a home in Darien, Connecticut, were looking for a house to purchase. The Bakers had the Premises on the CT Page 2215 market advertised as a seven bedroom residence with an asking price of about $550,000. (Exs. 2, 3.) In November 1997 the Schinks and the Bakers agreed on a price of $535,000.00. (Ex. 7.) The evidence at trial showed that the Premises, a little over an acre in size, contained a residential dwelling which generally faced east. The existing septic tank and leaching pit was to the south, and a wetland area was located in back, to the west of the residence.
The Schinks engaged Home Directions, Inc. to perform a home inspection. That inspection report by Everett Loppacker stated that "no septic system problems were apparent from my limited above ground inspection. Nevertheless, further underground investigation would be prudent given the unknown age and limited available area of the leaching system." (Ex 6, p. 1.) The report further noted that "the drainage area appears to be quite small for a seven-bedroom system and is hemmed in by a stream and what-appears-to-be wetlands." (Id., 21)
A. Relationship Between the Schinks and Laurel Hill
On or about November 17, 1997, the Schinks hired Laurel Hill for a septic inspection at the Premises. James Nizolek and Skiadas were present at the inspection, and Nizolek testified that there was visible effluent on top of the ground. (Tr. 8/3/01, 153.) Skiadas noticed black residue, meaning that water in the septic tank had remained at a very high level for some time. (Tr. 8/7/01, 74-76.) The conditions noted indicated that the existing system had failed. (Tr. 8/7/01, 74, 142; Tr. 8/3/01, 153.) The written report signed by Mr. Nizolek stated "the leaching facilities are filled to capacity". The report, which noted the Premises had seven bedrooms, continued, "there is a black residue on the top of the tank and in the soil that means that the tank has been filled to capacity on numerous occasions. At this time I recommend updating the system." (Ex 9.)
Laurel Hill sent a written preliminary proposal on November 20, 1997 which called for deep hole and percolation tests from which could be determined "what can be done." (Ex 12.) A rough cost estimate of $15,000 was given for an "addition/replacement of septic system". On December 4, 1997 Laurel Hill, having done some preliminary testing, sent a written proposal to the Schinks for "addition/replacement of septic system" which said "we are fairly confident . . . we will be able to install a system, the cost of which will not exceed $15,000.00." Significantly, the system was not described. (Ex 13.)
During this time there was a discussion between Laurel Hill and the Schinks about three septic system options. Two of the options involved a pump system to pump effluent to leaching areas to be located north or west CT Page 2216 of the residence. The remaining option would rely on gravity to dispose of the effluent to a leaching area south of the residence. The pump system options were described as costing $5,000.00 more than the $15,000.00 mentioned in the Laurel Hill proposal.
It is at this point that the testimony and other evidence becomes confused. Mrs. Schink testified that she understood Nizolek to be proposing to install a septic system which would be "code conforming" for a seven bedroom house, i.e. conforming to Health Code requirements for a house of that size. (Tr. 7/31/01, 102.) Mr. Schink testified that Nizolek said everything would be done "to code." (Tr 8/2/01, 28.) Mr. Schink also testified that there was no discussion about the size of the leaching fields. (Tr. 8/3/01, 87-88, 91.)
Nizolek testified that he was told neither the Schinks nor the Bakers wanted, or wanted to pay for, a septic system with a pump chamber. Apparently this decision was arrived at the time of the inspection, or shortly thereafter. (Tr. 8/7/01, 113-114.) From his perspective this negative reaction to the cost of the pump system left only the gravity fed option on the south side of the house for leaching fields. (Tr. 8/3/01, 106-107.) He further testified that the Schinks never said to him they wanted a septic system for a seven bedroom house even though they wanted a septic tank big enough for a seven bedroom house. (Tr. 8/3/01, 123.)
One of the few things that is clear in the record is that the Schinks did not understand or investigate what kind or size of septic system was being proposed by Laurel Hill or what kind or size of system met the standards of the Health Code. On the other side of the coin Laurel Hill failed utterly to communicate, explain, or recommend to the Schinks the size of the septic system it intended to install or the size of a system necessary to meet the Health Code requirements for a seven bedroom house.
B. Relationship Between the Schinks and the Bakers
By all accounts, the relationship between the Bakers and the Schinks between November 17, 1997 when the bid was accepted, through the contract negotiation period and the final closing on the Premises on March 17, 1998, was acrimonious. (E.g. Tr. 8/2/01, 37, 40-41; 8/3/01, 157-158, 184.) For instance, to this day, the parties disagree violently as to when the contract for purchase of the Premises was signed. Mr. Baker, who is a real estate attorney stated flatly that it was signed by his wife, the record owner on December 10, 1997 which is the date written on the contract and that the Schinks would have signed before hand (Tn 8/2/01, 167.) The Schinks and their real estate attorney put the actual signing a CT Page 2217 few days before Christmas. (Tr. 8/02/01, 187-188.)
The contract dated December 10, 1997 (Ex. 8), which had two lengthy riders, contained a provision relating to the septic system which provided that the Bakers (technically Mrs. Baker) would share in fifty percent of the cost of replacement of the existing system and this share would not exceed $7500. (Id. ¶ 8.) In a written exchange between attorneys on December 19, 1997 this provision was altered to read:
 "Buyer to replace septic system with 50% contribution from Seller up to a maximum of $7,500.00 which sum will be retained in escrow by Buyers attorney at closing and disbursed against actual costs of replacement. Such replacement shall be accomplished by Laurel Hill Septic Systems based upon a firm estimate for such work to be provided to Buyer and Seller by Laurel Hill Septic Systems after a permit has been received from the Stamford Health Dept. System replacement work will take place post closing however Seller will cooperate with Buyer, Laurel Hill, and the Stamford Health Department in permitting the minimum amount of site work to be done in order to obtain a permit prior to closing so that work can be commenced immediately post closing. All sums remaining in escrow six (6) months after the date of closing shall be returned to Seller. In no event shall any sums be expended from such escrow more than six (6) months after the date of closing.
(Ex 35.)
Another revision to one of the riders, not pertinent to this case, was agreed upon on December 24, 1997. (Ex. 36.)
C. The Relationship Between Laurel Hill and the Bakers
In connection with making a proposal to the Schinks, Mr. Nizolek visited the Premises (Tr. 8/2/01, 102.) He testified that during this visit Mr. Baker told him that the house had four bedrooms. When Nizolek commented that he thought there were seven, Mr. Baker said there were bedrooms in the attic of the house that they did not count. (Id. 99.) Nizolek testified that his understanding was it was a four bedroom house because the owner (meaning Mr. Baker) told him so. (Id. 122-123.)
Following the formation of the final version of the Schink-Baker real CT Page 2218 estate contract, Laurel Hill some time in late December 1997 or January 1998, prepared an application for a permit to make a septic "repair on the Premises. According to Skiadas he originally identified the residence on the application as having seven bedrooms. When he, Mr. Nizolek and Peter Dombrowski of the Stamford Health Department visited the Premises for a Health Department inspection in connection with the permit application, Skiadas, at Mr. Nizolek's direction, crossed out "7" and inserted "4" as the number of bedrooms. (Tr. 8/7/01, 25-26; Ex. 21W.) Thus, when Dombrowski approved the permit, he approved the requested "repair" work for what was designated as a four bedroom residence. The application indicated that Laurel Hill was proposing to install a 2000 gallon septic tank and 90 linear feed of leaching galleries providing 660 square feet of leaching area. The tank and galleries were to be located to the south of the house and be gravity fed. (Exs. 21W, 21Z.)
As part of the permit process Mrs. Baker as record owner of the Premises had to sign the permit application. Nizolek brought it to the Bakers on a February weekend when both Mr. and Mrs. Baker reviewed the document; Mrs. Baker corrected it to identify that she was the owner, and signed it although it plainly read four bedrooms. (Ex. 21 U.) Mr. Baker also read the document.
D. The Health Code
The Connecticut Health Code pertaining to septic systems was the subject of considerable testimony and is the basis of some of the parties' contentions. The Public Health Code is comprised of regulations and "Technical Standards" issued by the State Department of Public Health pursuant to its authority under General Statutes § 19a-36. The Code in its entirety is found in Section 19 of the Connecticut Regulations. The portion of the Code pertinent to this case, dealing with residential septic systems, begins at Section 19-13-B103a. The State Department of Public Health also publishes a "Design Manual" for residential and small commercial septic systems. On their face the Health Code provisions apply to all septic systems and state "these regulations establish minimum requirements . . . for subsurface sewage disposal systems." (§ 19-13-B103a.) The regulations provide that each septic system "shall be constructed, repaired altered or extended pursuant to the requirements of this section unless an exception is granted. . .". (§ 19-13-B103d(a).) A local health department may grant an exception to complying with the Code where it "determines . . . that the repair, alteration or extension cannot be effected in compliance with this section and upon a finding that such an exception is unlikely to cause a nuisance or health hazard". (§ 19-13-B103d(a)(1).) In the type of soil existing on the Premises the Health Code required effective leaching areas of 675 square feet for a three bedroom single family residence, 1200 square feet for a CT Page 2219 six bedroom residence and 1350 square feet for seven bedroom. (Health Code, Technical Standards, Table 6; Ex. 40, p. 46, compare Ex. V, p. 42.)
Complicating all of the above, the Design Manual states, with regard to repairs to a septic system,
 Repair Procedures The Public Health Code requires that all repairs to existing sewage disposal systems must be made in accordance with the requirements in the Technical Standards, unless a special exception is granted. This does not mean that every part of an existing sewage disposal system must be brought up to present standards whenever a repair is made. Rather, it means that all new construction must meet the minimum standards. However, it is the policy of the State Department of Public Health and most local health departments that whenever a repair is made, the deficient part of the system which appears to have caused the failure should be enlarged or replaced in accordance with minimum Code standards. For instance, if it is determined that the probable cause of failure is insufficient leaching area, the leaching system should be enlarged to the minimum size required by the Code, but a somewhat undersized septic tank need not be replaced
(Ex. 40.)
There was practically unanimous testimony from all sides of the spectrum (septic installers, engineers and a municipal health inspector) that the Health Code provisions were generally only applied to systems built in connection with new residential construction. (See e.g. Tr. 8/7/01, 136, 149.) That, of course is not what the Code says, nor is it necessarily a fair interpretation of the Design Manual. More importantly, there was considerable bothersome testimony from expert and lay witnesses alike that equated "code compliance" with the exception provision § 19-13-B103d(a)(1), quoted above. In other words a septic repair project was described as, or deemed to be, in compliance with the Health Code because it was thought to be within the provision which excepts it from complying with the Code. (See e.g. Tr. 8/10/01, 133-134;compare Id. 63-64.) This fuzzy, and often misleading, use of "code compliance" or similar verbiage is at the heart, and perhaps the cause, of a major dispute in this case. Furthermore, there was considerable CT Page 2220 testimony by several witnesses that local health authorities, including these in Stamford, rarely, if ever, required work on any existing system to meet the minimum Health Code standards. Indeed, the size of any allowable septic repair or addition to an existing system was not based on the residences number of bedrooms. (E.g. Tr. 8/7/01, 20, 142; Tr. 8/10/01, 122, 129, 139-40.) The evidence indicated that 70-80% of the residences in Stamford had systems that did not meet the requirements of the Code. (Tr. 8/10/01, 87.)
On March 17, 1998 the real estate closing on the Premises took place. (Ex. 4). A few days thereafter Laurel Hill commenced and completed the installation of a 2000 gallon septic tank and 90 linear feet of leaching fields on the south side of the house. In all, between 660 and 666 square feet of leaching fields were installed (Tr. 8/10/01, 113; Ex. 17, p. 2.) This leaching field was slightly smaller in size than that required for a three bedroom house. (Tr. 8/10/01, 113; Ex. 40, p. 46.) There was little dispute among the plaintiffs' and defendants' experts that the septic system installed, and the 660 square feet of leaching system was the maximum amount that could have been installed in the area to the south of the house. (Tr. 8/2/01, 74; Tr. 8/7/01, 145.)
In April the Schinks' architect visited the City of Stamford offices to obtain a building permit for the extensive renovations the Schinks planned at the Premises. The permit was not forthcoming because of what the Health Department deemed to be an inadequate septic system. As a result, until Laurel Hill drew up plans for a "paper" leaching field reserve north of the house, the Schinks were unable to gain a renovation permit and proceed with their plans. Laurel Hill prepared such a reserve, and the permit was granted.
Laurel Hill billed the Schinks for the installation of the system and the development of the reserve. The Schinks have not paid this bill. The $7500 that the Bakers put in escrow for the septic system was delivered to the Schinks in August 1998. (Ex. F.)
 III — SCHINKS' CLAIMS OF LIABILITY
A. Schinks' Claims Against the Laurel Hill Defendants
The chief thrust of the Schinks claims against the Laurel Hill defendants involve the allegations that the latter, while knowing the residence on the Premises had seven bedrooms and purportedly proposing a septic system to conform with the Health Code standards for a seven bedroom residence; in fact installed a system with leaching fields which, according to the Health Code, were sufficient only for a residence of two bedrooms. The Schinks further claim that in order to accomplish CT Page 2221 this Laurel Hill prepared a permit application identifying the residence as one of four bedrooms. According to the complaint this conduct constituted a breach of contract, a violation of CUTPA, fraud and negligence.
The legal definition of fraud is (1) a false representation made by a party as a statement of fact, (2) which was untrue and known to be untrue by the party making it, and (3) was made to induce the other party to act or rely upon it, and (4) the other party did so act or rely on it to its detriment. Weisman v. Kasper, 233 Conn. 531 (1995). Fraud must be proven by a higher standard than the preponderance of the evidence standard generally applicable in civil cases. This higher standard has been described as "clear and satisfactory evidence" or "clear and unequivocal evidence". Kilduff v. Adams, 219 Conn. 314, 327-8 (1991). For their fraud claim against Laurel Hill the Schinks focus largely on the fact that Laurel Hill represented that the system would be "code complying" and that Laurel Hill prepared a permit application for the septic work which described the house on the Premises as being one of four bedrooms. They point to the fact the sales listing for the house indicated seven bedrooms and that Laurel Hill's inspection report made out in November 1997 had the same information. Moreover the Schinks specified, and Laurel Hill installed, a 2000 gallon septic tank, the size generally used for a seven bedroom system, not for four bedrooms. Laurel Hill contended that the four bedroom information came from Mr. Baker.
After considering all the evidence the court concludes that the Schinks have not carried the heavy burden of proving fraud by the Laurel Hill defendants. Perhaps most importantly the court can discern no reason or motive for the Laurel Hill defendants to foist upon the Schinks a smaller and less expensive septic system if they understood the Schinks to want a larger system. Laurel Hill was told that the Schinks did not want a pump system. This may not have been an informed decision (a subject discussedinfra) but it undercuts the allegations of fraud. While listing the residence as four bedrooms on the permit application is difficult to justify, and even assuming that Laurel Hill knew that description was a misrepresentation, it is hard to see how the Schinks relied on it. if anything it was made to induce the Stamford Health Department to approve the permit, not to entice the Schinks to purchase a smaller system. There is simply no evidence to support the conclusion that the Laurel Hill defendants deliberately induced the Schinks to think they were obtaining a larger septic system than was actually installed. The Laurel Hill defendants did not ask for, or charge, a price commensurate with a larger system.
The court also concludes that to the extent Mr. Nizolek uttered words which were understood to mean the proposed system would be in compliance CT Page 2222 with the Health Code it is just as likely as not he was making the same reference to the escape provision (§ 19-13-B103d(a)(1)) as others in the business did through out the trial. In other words, Mr. Nizolek felt the Stamford Health Department would approve the system he was proposing and except it from the requirements of the Code because it was considerably better than the failed system it was replacing. The court credits Mr. Nizolek's testimony that he understood the Schinks did not want a pump system. Combining that with the references both Mr. and Mrs. Schink made that Laurel Hill was to "fix" the septic problem (e.g. Tr. 7/31/01, 52-53; Tr. 8/3/01 20-21) and their testimony that Mr. Nizolek said the Stamford Health Department would have to let them do this type of repair leads the court to conclude that Mr. Nizolek viewed this project as being accomplished under the code provision excepting that type of work from the strictures of the Health Code. In fact, that is exactly what happened.
In these circumstances the court concludes that while both Nizolek and the Schinks were extraordinarily derelict in communicating to each other what was wanted, and what was intended, there was no intentional representation on the part of Laurel Hill designed to mislead. The court finds the Schinks have not proven fraud by the exacting standards required.
The breach of contract claim against Laurel Hill fails because there was no meeting of the minds between the parties. The court finds that Laurel Hill did not intend to construct a septic system of the size required by the Health Code for a seven bedroom house (1350 square feet of leaching area) for the amount of $15,000 contained in its proposal, and there was no evidence at the time as to how much the Schinks would agree to pay for such a system.
The burden of proof rests with the Schinks to establish that its version of the alleged contract was in fact formed. Bridgeport PipeEngineering Co. v. DeMatteo Construction Co., 159 Conn. 242 (1970).
 The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties."
Cheverie v. Ashcraft Gerel, 65 Conn. App. 425, 439 (2001) (quoting from CT Page 2223Richter v. Danbury Hospital, 60 Conn. App. 280, 288 (2000). Even if one assumes that Mr. Nizolek said the proposed system would be "code conforming" the discussion above shows that his understanding and the Schinks' understanding of what that meant were miles apart. While the Schinks testified repeatedly at trial that they would have been willing to pay an additional $5,000.00 for the pump chamber system, if they had known that expenditure was necessary for a system large enough to meet the Health Code requirements, the fact is that they did not have that information at the time and therefore did not agree to that expenditure.
As to the negligence claim against Laurel Hill the court finds that by undertaking to inspect the septic system at the Premises and undertaking to propose a repaired or replacement system Laurel Hill owed a duty to the Schinks to perform these responsibilities in a competent and workmanlike manner consistent with their knowledge and experience in the field. At the time of the inspection Laurel Hill appears to have reasonably discharged its duty to report on the existing condition of the septic system on the Premises. However, in further undertaking to propose a replacement system and install such, Laurel Hill fell short of fulfilling its duty to the Schinks. The court concludes that, at the very least Laurel Hill had the duty to (1) explain to the Schinks exactly what type and size of septic system could be installed in the limited area south of the house and what the benefits or detriments of that system were in relation to the size of the house; (2) what the consequences were in possible type and size of systems if a pump chamber was utilized allowing the area north or west of the house to be used, (3) what size and type of system was suitable or recommended for, or required by, the Health Code for, the Premises and (4) failing to investigate or accurately report to the Health Department the number of bedrooms on the Premises. The court finds that Laurel Hill did not fulfill these duties and was negligent.
As discussed below, Laurel Hill was not the only negligent party. Nevertheless, the court determines that Mr. Nizolek, in particular failed to communicate to the Schinks adequate, or indeed any, information with respect to the first three subjects listed above. Indeed, during his somewhat terse and even cavalier testimony at trial when he had the opportunity to describe exactly what information and options he discussed with the Schinks, there was strikingly little forthcoming. The dearth of information given to the Schinks is confirmed by the testimony of Mr. Schink that his discussions with Mr. Nizolek did not get into detail about the merits or demerits of the three options for septic systems and did not cover the size of the leaching fields being proposed. (Tr. 8/3/01, 87-88, 91) and the testimony of Skiadas who said Mr. Nizolek's discussion with Mrs. Schink never included any explanation as to how much leaching area would be needed for a seven bedroom residence, or advice CT Page 2224 about the benefits gained from using a pump system. (Tr. 8/7/01, 78-84.) This omission led the Schinks to make some unwise decisions.
Similarly, Nizolek's testimony of how he came to the conclusion that the Premises contained only four bedrooms is hard to fathom. His initial information on this subject was that the house had seven bedrooms, and this was reflected on the Laurel Hill inspection report (Ex. 9). To conclude, as he said he did, that the actual number was four bedrooms based solely on the statement of Mr. Baker that he did not count rooms in the attic was a serious deviation from a septic installer's responsibility to know, that with respect to sizing a system to meet the Health Code and the City of Stamford requirements, it is the existence of potential bedrooms, not what an individual might call the rooms, that is material.
The Schinks also claimed that the work performed by Laurel Hill in installing the system was negligent. At trial the Laurel Hill defendants objected to the presentation of evidence on this claim contending that it was not encompassed within the scope of the complaint, that they had not been aware of any negligent workmanship issue, and were prejudiced by its introduction into the case at that late date. The Schinks responded that the contention was covered by the language of the existing complaint, but in the alternative sought to amend the complaint to include it more specifically. The court reserved decision on the matter but permitted the introduction of evidence on the issue. A review of the file shows that in a pre trial memorandum dated November 2, 2000 the Schinks distinctly claimed that the Laurel Hill system required repair and estimated the expenses for those repairs at $5,000. While arguably the initial pleading was not as specific as it might have been, the defendants had notice of the claim. Therefore, the motion to amend is granted.
The evidence on the workmanship issue was a mixed bag. Mrs. Schink testified that the waste pipe in the basement, installed by Laurel Hill, was not glued correctly and fecal matter and other waste leaked on to the floor. This was repaired by a plumber, but problems persisted. Finally, a septic installer, Kaiser-Battistone excavated the PVC pipe leading to septic tank and discovered part of it broken and another section bowed in such a manner as to block passage.
The bills of the plumber, Nardo, were submitted as evidence but no representative of Nardo testified, and the commentary on the bill was therefore excluded. Nevertheless, Mr. Schink was competent to describe what happened. Additionally, Laurel Hill did not have a plumber's license and should not have been working on the waste pipe inside the residence. (Tr. 8/7/01, 63-66.) The evidence shows that work inside the house was done negligently. The Kaiser-Battistone witness was not able to attribute CT Page 2225 the problems with the PVC pipe outside of the house to Laurel Hill's negligence, and that claim is dismissed.
The plaintiffs' CUTPA claim rests in part on the fact that the septic permit submitted to the Stamford Health Department was physically signed by Paul Skiadas who signed Mr. Nizolek's name and added Nizolek's license number. (Tr. 8/7/01, 22-23; ex. 21w.) There was no real plausible explanation or justification for this procedure, and it appears to be indefensible. While there is testimony that had the Health Department known of the false signature the permit application would not have been accepted (Tr. 8/10/01, 101) the court is persuaded a quickly corrected application (with the right signature) would have been accepted and processed and further finds there is no causal connection between the forged signature and any loss suffered by the Schinks. The court also finds the negligence of Laurel Hill, detailed above, does not rise to the type of deceit, unfairness or unscrupulousness required for a CUTPA violation.
B. Schinks' Claims Against the Bakers
The Schinks' claims against the Bakers include breach of contract, breach of the duty of good faith and fair dealing, fraud and promissory estoppel. The major thrust of the complaint against the Bakers is that they misrepresented the size and condition of the existing septic system.
The court finds that there was no breach of contract. The Schinks have not pointed to any specific provision of their contract with Mrs. Baker which was breached. The allegation of breach of contract contained in the complaint is that Mrs. Baker sold the Premises with "systems" not in compliance with state, local and municipal codes and regulations. This is not a violation of the contract. The contract contained an explicit provision that the Schinks had inspected and were satisfied with the physical condition of the Premises which were being sold on an "as is" basis. (Ex. 8, ¶ 7.) The only representation made by Mrs. Baker about the septic system stated that it required only normal maintenance. This may have been inaccurate, but the representation explicitly did not survive the closing of title. (Id. Buyer's Rider, ¶ 3.) The Schinks also refer to the undertaking quoted above at Section II-B about the escrow as surviving the closing but there is no evidence this part of the contract was breached. Indeed, the $7500 was put in escrow and paid over to the Schinks.
With respect to their fraud claims against the Bakers, the Schinks contend that the Premises were marketed as a seven bedroom house and that it was represented that the septic was conforming to that size and CT Page 2226 without any problems. Those representations may well have been made or properly inferred. The Schinks make much of the existing condition of the septic system. They contend that the system was operating poorly if at all, while the Premises was being marketed for sale and that the system was inadequate for a seven bedroom house. The evidence tends to support this. A representative of Procaccini which serviced the septic system while the Bakers owned the Premises testified that the system had been serviced and pumped out in October 1997. In addition Mrs. Baker's real estate disclosure form indicated a service in February 1997. (Ex. 8.) Thus, despite being serviced at six month intervals for two years, the Laurel Hill inspection found it filled to capacity, if not overflowing less than two months after the last visit by Procaccini. With only two people living at the Premises it is reasonable to infer the Bakers knew or should have known they had a septic problem.
The Schinks contend that all these problems make the Bakers' representation, express or implied, about the size and viability of the septic system misleading and fraudulent. Mrs. Schink testified on two separate occasions that they would not have bought the Premises had they known that the existing septic system was in such bad shape. (Tr. 7/31/01, 88; Tr. 8/10/01, 153.) However, despite whatever representations were made, their legal effect was vitiated by the septic inspection revealing the system's defects. This inspection, made prior to the execution of the contract, communicated to the Schinks that, for all intents and purposes, the Premises had no working septic system. Indeed Mrs. Schink, present protestations to the contrary, knew the system had failed. (Tr. 8/1/01 (AM) 52.) Moreover, Laurel Hill's proposal to the Schinks envisioned a replacement of the system, i.e. the destruction of the existing leaching pit, removal of the old septic tank, and installation of a new effluent pipe from the house to a newly installed tank and new leaching fields. Thus, prior to signing the real estate contract the Schinks had sufficient present information about the actual condition of the system to overcome any representations otherwise.
The fourth count of the complaint alleges promissory estoppel or detrimental reliance. This is a type of contract action. The elements of a promissory estoppel claim are that the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to change position in reliance thereon. Union Carbide Corp v. Cityof Danbury, 257 Conn. 865 (2001). This claim faces the same hurdles as the fraud and contract claims. The inspection of the septic system by the Schinks off sets any claim of reasonable reliance on statements concerning the septic system.
The Schinks have also alleged a claim of civil conspiracy against both the Bakers and Laurel Hill. As stated in an earlier decision in this CT Page 2227 case, Connecticut courts recognize such a cause of action. See Schink v.Baker, Superior Court, judicial district of Stamford/Norwalk at Stamford, CV 99 017 2704 (July 12, 2000, Karazin, J.) (citing Marshak v.Marshak, 226 Conn. 652 (1993). The essential elements of the tort of civil conspiracy are (1) a combination between two or more persons, (2) to do a criminal or unlawful act or an act by criminal or unlawful means, (3) some act by the alleged conspirators in furtherance of the scheme or conspiracy, and (4) which causes damage to the claimant. Id.
The plaintiffs have not proven the first element, a combination. The combination required is an agreement to pursue certain actions and/or attain certain ends. There is no persuasive evidence in this case that Laurel Hill, or any of its individuals entered into any agreement or combination with the Bakers.
The Schinks have claimed that the Bakers breached the implied duty of good faith and fair dealing which arose out of the contract for the purchase and sale of the Premises. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement". 2 Restatement (Second) Contracts, § 205 (1979). This implied duty is recognized in Connecticut. Hoskins v. Titan ValueEquities Group, Inc., 252 Conn. 789 (2000); Magnan v. AnacondaIndustries, Inc., 193 Conn. 558 (1984).
The real estate purchase and sales contract contained the provision quoted in full on page 6, supra dealing with the septic system replacement work to be done by Laurel Hill after the closing. In that provision Mrs. Baker undertook explicitly to cooperate with the Schinks, Laurel Hill and the Stamford Health Department in permitting the minimum amount of site work to be done (i.e. testing) in order to obtain a permit so that the installation could be done as soon as possible after title to the Premises passed. This explicit contractual undertaking was designed to benefit the Schinks and assist them in replacing the failed existing septic system and carried with it the obligation that the Bakers' actions in this regard be undertaken fairly and in good faith. Mr. Baker recognized this obligation existed. (Tr. 8/2/01, 171.)
The evidentiary basis for the claim of breach of the duty of good faith and unfair dealing rests on the Bakers participation in the application for, and approval by the Stamford Health Department of, the permit to construct the Laurel Hill designed septic system. The application described the Premises as containing a four bedroom residence even though it was marketed and sold as, and in fact was, a seven bedroom residence. This participation included Mr. Baker's conversation with Mr. Nizolek (which is recounted on pages 6-7 supra) that led to Nizolek's conclusion that there were the lower number of bedrooms and also Mrs. Baker's CT Page 2228 approval and signing of the permit application which stated four bedrooms.
The actions of Mrs. Baker, and those of Mr. Baker, who acted throughout the pre and post contract stage as her agent, violated the implied duty engendered by the contract. This conclusion is based on consideration of several related factors. First, the error in the application was obvious, and neither Baker provided any explanation for it. The application was brought to the Bakers at the Premises by Mr. Nizolek on a Saturday in early February 1998. As her husband pointed out, Mrs. Baker read the application carefully, (she is a geometry, trigonometry and calculus teacher) and corrected it to indicate that she, not her husband, was the owner of the Premises. She was sure there was a discussion about the number of bedrooms shown on the application (four) but she testified she did not remember the contents of the discussion. At other times she testified there was no discussion, and she could not recollect whether the application said four bedrooms when she signed it (Tr. 8/2/01 113 — 116). In short, her testimony was quite imprecise and contained no explanation for the error. (Id, 130.) Mr. Baker was also present at the conversation that Saturday morning about the bedrooms, but he did not recall what those discussions were. He went on to say that presumably he and his wife received some information about why the application stated four bedrooms that satisfied them. (Id, 148.)
Second Mr. Baker's testimony contained several significant errors. His testimony about the chronology of contract formation appears to be incorrect (see discussion at 5-6 supra). He also stated definitively that he had never had "any conversations with anyone from Laurel Hill at any time in my career" (Id. 150) which was clearly incorrect since the evidence shows he had talked to Mr. Nizolek about the number of bedrooms in the house in December and again on the February Saturday morning. Third, the Bakers were extremely defensive about the septic conditions on the Premises. Despite having the system cleaned often, there were two separate instances when effluent was noted on the ground, once at the November inspection and again when the Health Department was present at the Premises (Tr. 8/3/01, 153; Tr. 8/10/01, 48-49) yet both steadfastly asserted they had no septic problems. (Tr. 8/2/01, 105, 123, 141.) These imprecisions and inaccuracies cast a pall over other aspects of their testimony.
While maintaining there was nothing wrong with the septic system, it is notable that the Bakers rather readily agreed to pay up to $7,500 for a "replacement" system even without knowing the reasons it was needed (Tr. 8/3 174-5.) This along with some evidence that one of the Bakers was present at the November septic inspection (Tr. 8/7/01, 80, 113) and that Mr. Baker received a copy of the Laurel Hill proposal (Ex. 1; Tr. CT Page 2229 7/31/01, 33) supports the strong inference that they knew their system had serious problems and were anxious to have a permit granted as quickly as possible. All of this taken in the light of the bitter relationship between the Bakers and Schinks leads to the conclusion that the Bakers were not acting in the Schinks best interests, but in their own. Their interest was to sell the Premises as quickly as possible; it had been on the market for six months; had been on the market twice in prior years, and the Schinks' offer was the first formal one the Bakers had received. (Tr. 7/31/01, 27-28; Tr. 8/2/01, 143; Tr. 8/3/01, 118.) It was in the Baker's interest to get the septic permit as quickly as possible, so that there would be no more contingencies. Whether the Bakers understood on their own, or from what Laurel Hill told them, that the relatively small leaching field system being proposed was more likely to be approved if the residence was designated as four rather than seven bedrooms can only be surmised. What is not surmise, however, is the fact that the Bakers were eager to put this problem to bed, and the court finds that Mrs. Baker, with her husbands approval, signed the application for a permit knowing it was inaccurate. This was a breach of the covenant of good faith and fair dealing.
 IV — THE SCHINKS' DAMAGES
Having found for the Schinks on their claim of negligence against Laurel Hill Landscaping, Inc. and on their claim of breach of the covenant of good faith and fair dealing against Mrs. Baker, the court turns to the subject of damages.
A. Laurel Hill Landscaping, Inc.[1]
The Schinks claim total damages of $117,086.90 including actual and estimated legal fees of a little under $30,000.00. Much of the damages claimed by the Schinks is related to estimated costs of installing a system designed by their engineering consultant. The Schinks contend that they either would not have bought the Premises if they had known of the true condition of the existing system, or paid less than the $535,000 contracted for. However, they also claim that they would have readily paid the additional $5,000 for a pump chamber if they had known how "inadequate" the system without a pump chamber would be. The first two claims lack merit. As discussed earlier they had the information about the condition of the existing system before they executed the purchase contract. What they might have paid for the Premises and what the Bakers would have accepted is conjecture. What they did not know was the cost and size of an appropriate septic system to replace that which had failed. Amid the somewhat conflicting evidence the court must ascertain what damages were proximately caused by Laurel Hill's negligence which consisted of inter alia failing to inform the Schinks of the cost of and CT Page 2230 efficacy of a larger system with a pump system.
There is little doubt that some of the acts and omissions of the Schinks may have contributed to the situation. Their failure to take heed of the Loppacker inspection report's description of the Premises's small drainage area and their precipitous rejection of a pump system might have been the subject of a contributory negligence claim, but such was not pleaded.
The claim for the cost of installing a larger septic system does not withstand scrutiny. The fact that the Schinks do not have the system they now claim they wanted may indeed be, in part, the result of Laurel Hill's failure to provide adequate information, but if full information had led the Schinks to authorize a larger system, they would have paid for it. It is arguable that negotiation might have led to the Bakers contributing more than $7,500, but again, that result is the product of only speculation. Thus, the claims of $25,000 for construction of a septic system complying with the Health Code, and almost $30,000 for removal and replacement of shrubs and trees are denied.
The damage suffered by the Schinks is what it cost them to obtain the information they failed to receive from Laurel Hill, i.e. an analysis of what type and scope of septic system best fit the needs of the Premises and the cost and feasibility of such a system. That information was eventually provided to the Schinks, in part, by Rocco V. D'Andrea, Inc., an engineering company which consulted with Schinks, reviewed the Laurel Hill installation, surveyed the area and made recommendations. D'Andrea also prepared information to allow septic installers and others to estimate the cost of their work.
The court awards $5,987 in damages based on two D'Andrea bills. (Exs. 30K, 30L, 30DD.) An additional award of $1,500 is made based on an estimate of how much should be allocated out of a contract between the Schinks and D'Andrea to reflect work which led to developing information sufficient to allow septic installers to estimate the cost of the project. The above allocation reflects that some of this work was also part of the cost of the system itself (Ex. 300.)
With respect to the negligent workmanship claim the Schinks were damaged in the amount of the Nardo Plumbing bills, $930.26 (Exs. 30BB, 30CC) and an additional $2,000 for damages arising from the inconvenience and distress reasonably related to having raw sewage flowing into their basement.
Other claims for damages are not supported by the evidence. CT Page 2231
B. Mrs. Baker
The measure of damages for breach of the covenant of good faith and fair dealing is the same as for breach of contract. if the Bakers had not breached the covenant they would have corrected the application for a septic installation permit to describe the house as containing seven bedrooms. The consequences of that action are unclear. The Schinks presented the testimony of Anthony D'Andrea, an engineer with extensive experience in the septic permit application process in Stamford. He stated that if the application had been presented to the Health Department showing seven bedrooms the Laurel Hill-proposed project "should not have been approved" (Tr.8/2/01, 57; see also Id. 63.). However Peter Dombrowski of the Stamford Health Department testified that an application designating a seven bedroom would have been approved. (Tr. 8/10/02, 57-58, 96-97.) Basically, he emphasized that in a situation where a replacement or repair is necessary the Health Department takes the view that a little improvement is better than none at all and there is little means of forcing an owner to comply with the Health Code. (Id. 99, 122, 129, 139-140.) It would only be speculation that something other than approval would have resulted if the application had referenced seven bedrooms. (Id 138.) Both witnesses were in a position to know, but since Dombrowski was, in fact, the official who did approve the application and D'Andrea's testimony was necessarily given in a more hypothetical vein ("should" rather than "would") the court concludes that, despite considerable effort, the plaintiffs have not established what, if any, damages they sustained because of the Bakers' breach. The court is constrained to note that, in fact, Dombrowski had approved the permit before the application was signed by Mrs. Baker. Whether he would have rescinded the approval if the corrected application had been resubmitted is conjecture. Whether it would have been resubmitted is also conjecture. It is not conjecture that when he later learned that there were seven bedrooms in the residence, Dombrowski was apparently unconcerned and took no action. (Id. 84-86, 104-105, 142.)
The plaintiffs have not met their burden of proof that actual damages resulted from the Bakers' breach. Therefore, the court awards nominal damages of $1.00.
 V — LAUREL HILL DEFENDANTS' COUNTERCLAIMS
The Laurel Hill defendants' counterclaims seek payment from the Schinks of the invoiced amounts for the installation of the septic system the preparation of the reserve and the delivery of top soil. The invoice totals $16,426.00 (Ex. G) including $15,000.00 for the system, $1,250.00 for the additional testing in April 1998 to set up the reserve area and $176.00 for the top soil delivered in June. The invoice to the Schinks CT Page 2232 has concededly not been paid (Tr. 8/2/01, 6.) The Laurel Hill defendants allege breach of contract, unjust enrichment and violation of CUTPA.
The testimony and evidence at trial establishes that with certain exceptions already noted the septic system installed by Laurel Hill has operated as designed and continues to operate as the septic system for the Premises. Anthony D'Andrea, the Schinks' engineer testified that the system was a significant improvement, working properly and is incorporated into the system he designed for the Schinks. (Tr 8/1/01 (PM) 41, 69 see also Ex. 16.)
In addition, the court finds that the work to establish the paper reserve area to the north of the house would have been unnecessary if Laurel Hill had submitted a permit application for a seven bedroom residence. This conclusion is based on the testimony of Dombrowski. (Tr. 8/10/01, 82-83, 106.) Therefore, Laurel Hill is not entitled to $1,250 of the total invoice.
Based on these findings and the conclusions set in Part IV-A above, the court determines that Laurel Hill is entitled to the invoiced amount for the septic installation, $15,000, and the top soil, $176., less the amount of the plumber's bill, $930.26, for a total of $14,245.74.
 VI — LAUREL HILL MECHANIC'S LIEN ACTION
On August 31, 1998 Laurel Landscaping Service, Inc. filed on the land records of Stamford a mechanic's lien on the Premises in the amount of $16,426.00. A complaint seeking to foreclose the lien was returned to the court on August 31, 1999.
In order to be valid a mechanic's lien must be served and filed within ninety days of the completion of the work upon which the lien is based. General Statute § 49-34. In this case the septic system was installed by March 24, 1998 (Ex H) and the paper reserve was created in April 1998. There was testimony from Mr. Schink that subsequently, on June 15, 1998, he requested Laurel Hill to deliver top soil to finish covering the ground where the septic installation took place. (Tr. 8/2/01, 46 — 48.) Mrs. Nizolek testified that the top soil was delivered to the Premises on or about June 3, 1998. (Tr. 8/7/01 205 — 206) Mr. Schink believes the top soil delivery was later than that. (Tr 8/3/01, 37.) Our Supreme Court has stated that where the land owner requests the lienor to provide additional services at a later date the ninety day period of § 49-34 begins to run from the date of such additional services. F.B. Mattson Co., Inc. v. Tarte, 247 Conn. 234, 240 — 242 (1998) This court holds that the mechanic's lien was timely filed. CT Page 2233
In Part V the debt found to be owing by the Schinks to Laurel Hill was $14,245.74. In Part IV-A the court awarded $9,487 to the Schinks from Laurel Hill on the claim of negligence (including the non economic damages and not including the plumber's bill which have been deducted from the Laurel Hill claim in Part V.)
Because the two matters were tried and decided on a consolidated basis the court offsets the Schinks' damages from the reduced lien amount and holds the lien enforceable in the net amount of $4,758.74. Prejudgment interest is awarded from the date of invoice. General Statutes § 37-3a.
The lien is foreclosed. Laurel Hill may place the matter on the Short Calendar for the setting of law days.
 VII — SUMMARY AND ORDERS
The court finds in favor of the plaintiffs on their claim of negligence against Laurel Hill Landscaping, Inc. in the amount of $9,487; of this amount $2,000 is non-economic damages. The court also finds in favor of the plaintiffs on their claim against Mrs. Baker and awards nominal damages of one dollar. All other claims against the defendants are dismissed.
The court finds in favor of Laurel Hill Landscaping, Inc. on its counterclaim against the Schinks for unjust enrichment in the amount of $14,245.74. All other counterclaims are dismissed.
Laurel Hills Landscaping, Inc.'s mechanic's lien in the amount of $4,758.74 is foreclosed.
ADAMS, J.